[S. F. No. 5685. Department One.—November 28, 1911.]

## JAMES C. DUNPHY, Respondent, v. LYDIA M. DUNPHY, Appellant.

MARRIAGE—ANNULMENT FOR MENTAL INCOMPETENCY—TEST OF INCOMPETENCY.—What degree of unsoundness of mind will authorize a judgment annulling a marriage is to be determined by the same tests which are applied in any case where it is sought to set aside the contract or other act of a person alleged to be insane. A mere variation from a normal mental condition is not enough, but the mental defect or derangement must be one having a direct bearing upon the particular act, and to render the party seeking to annul the marriage both at the time it was contracted and while cohabitation continued, incapable of understanding the nature of the duties and obligations imposed by the marriage contract. In the present case, the evidence is held sufficient to sustain the finding that the plaintiff was so mentally incapable.

Id.—Findings as to Mental Capacity—Evidence—Review on Appeal.
—The determination of the issues raised as to such mental capacity
is primarily for the trial court and its findings can be overthrown
on appeal only when they totally lack the support of substantial
evidence. In reviewing the evidence tending to support such find-
ings, so far as it is subject to differing inferences, the appellate
court must read it in the light most favorable to the party prevailing
below.

Id.—Evidence of Intimate Acquaintance—Opinion of Witness.—
Where the reasons assigned by an intimate acquaintance witness, in
support of his opinion of the unsoundness of mind of the person
whose mental capacity is in question, have some bearing on the
matter, it is for the trial court to determine the weight to be
given to the opinion.

Id.—Weight to be Attributed to Opinion.—As the statute expressly
permits such opinion to be given in evidence, it must contemplate
that some weight may be attributed to the opinion, over and above
that which would follow, as matter of necessary inference, from the
reasons assigned.

Id.—Appointment of Guardian ad litem.—Under sections 372 and 373
of the Code of Civil Procedure, the trial court has authority, upon
the application of a relative of the plaintiff and evidence tending
to show his incompetency, to appoint a guardian *ad litem* for him
in an action brought by him to annul his marriage on the ground
that he was mentally incompetent at the time he entered into the
marriage contract.

Id.—Filing Amended Complaint—Discretion.—In such action, after
the appointment of the guardian *ad litem*, it is within the discretion
of the trial court to permit the filing of an amended complaint.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco. James M. Seawell, Judge.

The facts are stated in the opinion of the court.

Timothy J. Lyons, Bishop, Hoefler, Cook & Harwood, and
Raymond Benjamin, for Appellant.

Morrison, Dunne & Brobeck, *Amici Curiæ*, on petition for
hearing in Bank

J. H. Meredith, and Perry Evans, for Respondent.

SLOSS, J.—On the twenty-second day of June, 1909, a
marriage ceremony was performed between James C. Dunphy
and Lydia M. Valencia. Six days later, the plaintiff, James

C. Dunphy, commenced this action to annul said marriage by filing a complaint in which he alleged that, at the time of the ceremony, he was so intoxicated from alcoholic drinks that he had no comprehension of what he was doing, or of the nature or effect of said ceremony, and that, by reason of said intoxication, he was then mentally incompetent to contract marriage. He alleged, further, that at all times after the ceremony and until the commencement of the action, he had been intoxicated and had not had normal control of his mental faculties; that as soon as he realized the purport and effect of said ceremony, on the twenty-sixth day of June, 1909, he had left the defendant, and had not thereafter cohabited with her. The defendant demurred, denying the allegations of plaintiff's intoxication and incompetency, and averring that he had voluntarily cohabited with her. She also cross-complained, alleging the marriage, desertion of her by plaintiff, his possession and her want of means, and asking a judgment for maintenance. The plaintiff answered the cross-complaint.

Subsequently, on November 15, 1909, an amended complaint, seeking annulment of the marriage upon an allegation that plaintiff, at the time of the marriage and ever since had been of unsound mind, was filed in the name of plaintiff, by Jennie C. Dunphy, his guardian *ad litem*. The appointment of the guardian was alleged to have been made on November 10, 1909. To this amended complaint, after filing a demurrer, which was overruled, the defendant answered, denying the appointment of the guardian and the unsoundness of mind of the plaintiff, and averring voluntary cohabitation.

The case was tried and the court found as facts the due appointment of the guardian, that the parties were married as alleged, that the plaintiff at the time of said marriage was of unsound mind, that plaintiff had never, since the marriage, freely cohabited with the defendant as her husband, and that he had continued to be of unsound mind from the time of the marriage until after the twenty-first day of July, 1909, the day upon which he finally left the defendant. Judgment annulling the marriage followed. The defendant appeals from the judgment, bringing up the evidence by means of a bill of exceptions.

The principal contention of the appellant is that the evidence is insufficient to sustain the finding that plaintiff was of

unsound mind at the time of the marriage and during the time of his cohabitation with the defendant.

This court has never had occasion to define the degree of unsoundness of mind which will authorize a judgment annulling a marriage. But we take it that the question of what is an unsound mind must, in cases of this character, be determined by the same tests which are applied in any case where it is sought to set aside the contract or other act of a person alleged to be insane. It is universally held that a variation from a normal mental condition is not in itself enough to avoid every act. The mental defect or derangement must be one having a direct bearing upon the particular act which is brought in question. Thus, in will contests, the validity of the testamentary effort is not affected by delusions on the part of the testator, unless the delusions are such as to have been "operative in the testamentary act." (*In re Redfield,* 116 Cal. 637, [48 Pac. 794].) They must have a relation to some person or object affected by the will. (Id.) In *Estate of McKenna,* 143 Cal. 580, [77 Pac. 461], this court upheld an instruction to the effect that it was only such insane delusions as actually influenced the testatrix in the making of the will, and which caused its production to the prejudice and injury of the contestants, which would invalidate the will. So, in criminal cases, a partial insanity, or an insanity with respect to certain subjects, is not incompatible with the possession of mental capacity sufficient to make the party liable to punishment for his acts. (*People* v. *Willard,* 150 Cal. 543, [89 Pac. 124].) The same reasoning is to be applied when the question is the mental capacity of a party to contract marriage. "The true test in actions to annul a marriage on account of insanity at the time of the marriage," says Nelson (Divorce and Separation, sec. 658) is whether the party was capable of understanding the obligations assumed by marriage." The capacity requisite to a valid marriage is defined, in *Durham* v. *Durham,* 10 Probate Division 80, as "a capacity to understand the nature of the contract, and the duties and responsibilities which it creates." (See, also, *Kern* v. *Kern,* 51 N. J. Eq. 574, [26 Atl. 837] ; *Lewis* v. *Lewis,* 44 Minn. 124, [20 Am. St. Rep. 559, 9 L. R. A. 505, 46 N. W. 323] ; *St. George* v. *Biddeford,* 76 Me. 593.) The learned judge below undertook, as appears from his opinion contained in the transcript, to apply this

test to the evidence before him, and, so applying it, reached the conclusion that Dunphy, at the time of the marriage and while he was cohabiting with the defendant, did not possess the mental capacity to understand the nature of the duties and obligations imposed by the marriage.contract. Was there enough evidence to justify this conclusion?

The testimony, the greater part of which deals with this issue, is voluminous, covering almost 650 pages of the printed transcript. It would prolong this opinion beyond all reasonable bounds to give more than the briefest summary of the facts testified to by the large number of witnesses called. In referring to the testimony, we must constantly bear in mind that the determination of issues of fact is primarily for the trial court, and that the findings of that court are to be overthrown on appeal only when they totally lack the support of substantial evidence. We are not empowered to determine, as an original question, whether the plaintiff was or was not of unsound mind. Our duty begins and ends with the inquiry whether the trial court had before it evidence upon which an unprejudiced mind might reasonably have reached the conclusion which was reached. Conflicts of testimony are deemed to have been finally resolved in the court below. Accordingly, the testimony in support of the finding attacked, if sufficient to support that finding, is all that need be mentioned in this opinion, and this testimony must, so far as it is subject to differing inferences, be read in the light most favorable to the party prevailing below.

The plaintiff was the only son of wealthy parents, and from his early youth had followed no regular occupation, with the exception of giving some casual and intermittent attention to the affairs of his father's estate, in which he was interested. For many years, he had been addicted to the habit of drinking intoxicating liquors to excess, taking, as one witness testified, from twenty to forty drinks of whiskey in a day. On one or more occasions his excesses in this direction had brought on attacks of delirium tremens. He was frequently seen in public places in a condition of helpless intoxication. He was unable, in conversation, to concentrate his mind upon a subject under discussion, showed little intelligent interest in his own business affairs, was vacillating and uncertain, as well as suspicious, and showed signs of failing memory.

In support of the allegations of the complaint, a number of witnesses, having first qualified as intimate acquaintances of Dunphy, expressed the opinion that he was of unsound mind. In accordance with the provision of the Code of Civil Procedure (sec. 1870, subd. 10) each of these witnesses gave "the reason for the opinion." The appellant undertakes to analyze the various reasons so given, and argues that they are not adequate to justify the conclusion drawn from them. Reliance is placed upon *Estate of Dolbeer*, 149 Cal. 227, [86 Pac. 695], where it was said that the opinion of an intimate acquaintance respecting the mental sanity of a person "can have no weight other than that which the reasons" (upon which it is based) "bring to its support." We do not understand this to mean that the appellate court is to put itself in the position of the trial court, and, from an examination of the reasons assigned, determine as an original question whether the opinion of the witness is to be given any weight or is to be rejected. No doubt the reasons assigned may be so irrelevant or inconsequential as to deprive the opinion, professedly based upon them, of any probative value. This, as the court viewed it, was the situation in the Dolbeer case. But where the reasons assigned have some bearing on the question of mental capacity, it is for the court below to determine the weight to be given to the opinion of the witness. The statute expressly permits such opinion to be given in evidence, and it must contemplate that some weight may be attributed to the opinion, over and above that which would follow, as matter of necessary inference, from the reasons assigned. If this were not so, there would be no justification for permitting an intimate acquaintance to state his opinion at all. He should then be restricted to a statement of his observations of the person whose sanity was questioned, and a conclusion on the ultimate question of soundness or unsoundness of mind would have to be drawn by the trial court or jury from the facts so stated. But it may be that an intimate acquaintance has a well founded opinion on this subject, without being able to recall, or to formulate in words, all of the impressions which by their cumulative force have led his mind to the opinion. (Indeed, some of the witnesses here declared that this was, virtually, their situation.) The opinion itself is not for that reason worthless; nor is its weight to be judged solely by the conclu-

CLXI Cal.—13

sion which another mind might draw from a recital of the reasons which the witness is able to give. If, as we have said, those reasons furnish any logical support for the opinion declared, the opinion, in and of itself, is to be given such weight as the trial court may think it deserves.

With reference to the testimony in this case, it would be impracticable to follow counsel into the field they have entered, and to discuss the multitude of incidents, many of them no doubt trivial in themselves, brought forward by those testifying to their opinion that Dunphy was of unsound mind. We must content ourselves with the statement that some, at least, of these witnesses fortified their opinions by a recital of reasons which had some legitimate bearing upon the question at issue. In this connection, we may cite, in addition to the facts stated by intimate acquaintances regarding Dunphy's habits of life, the account given by himself to witness Curtis. of a former marriage contracted by him. On January 3, 1903, he notified Curtis that he had been married on the preceding night, and requested that his family be informed. On the following day he told Curtis that he had not wanted to marry the lady, that the marriage had taken place, in effect, at a moment's notice, that he didn't know what he was doing at the time, and that he thought a thousand dollars would "call it off." We mention this, out of many circumstances shown in the record, because it has a more direct bearing on the question of the plaintiff's capacity to understand the nature of the marriage relation and the obligations attendant upon it.

Besides this, the plaintiff introduced the testimony of three medical experts. In response to hypothetical questions, embodying the showing made by plaintiff's witnesses concerning his intemperate life, each of these witnesses testified that a person who had led such life would be of unsound mind. One of them said that drinking to the extent stated "would have the effect of inducing a mental disease by producing an organic change in the brain. . . . He would necessarily be of unsound mind. . . . His brain has so degenerated by the use of whiskey that his thoughts are as liable to be abnormal as normal," even when he is "not under the influence of liquor." The others testified that the person supposed was "of unsound mind."

The circumstances attending the marriage of the parties

were, to say the least, peculiar. Dunphy and the defendant had been acquainted for a number of years. The exact nature of their relations does not appear. It was shown, however, that, while both resided in the same city (San Francisco), Dunphy had not, prior to the day of the marriage, visited the defendant at her home. There was no engagement, no exchange or giving of a ring or other presents. According to the testimony, the parties agreed, on the morning of the 22d of June, 1909, to be married, and on the same day, without any further preparation, without having made a change of clothing, or any provision for a wedding journey or a place of residence following the proposed marriage, they went in an automobile, accompanied by several friends of the defendant, to Redwood City, where a license was obtained, and a marriage ceremony was performed by a justice of the peace. On the road to Redwood city, and a few hours before the ceremony, the party had stopped at a road house. A witness who saw them there testified that Dunphy was "very badly under the influence of liquor, or extremely intoxicated," that he appeared disheveled and his dress seemed to be more or less disarranged. While the evidence makes it probable that the demeanor of plaintiff at the time the ceremony was performed did not indicate to those who were present that he was intoxicated, the trial court may well have concluded from all the facts before it, that he was still under the influence of liquor to such an extent as to affect his capacity for rational thought and action. In this connection it may be noted that there was testimony that Dunphy had been seen in a state of pronounced intoxication during every day from the thirteenth to the seventeenth of June, 1909, while he was in Sacramento, and that he was intoxicated after his return to San Francisco on the twentieth of June, and again on the twenty-first, the day preceding that of the ceremony. Following the ceremony, the parties returned to San Francisco, and took up their abode in the defendant's flat. On the next day, the morning newspapers of San Francisco, containing articles relative to the marriage, were read by Dunphy. Among these publications was one which depicted the plaintiff as a dissipated spendthrift, and described the defendant's character and antecedents at some length in terms that would necessarily have been extremely offensive to any one entertaining any feeling

of respect for her. The ceremony itself was represented as preceded and followed by drunken revels. Without going into greater detail regarding the contents of this article, we may say that it is almost inconceivable that they would not have aroused the deepest resentment and indignation in Dunphy, if he had possessed a rational understanding of the nature and the obligations of marriage. Yet, after reading the papers, he expressed himself as "not at all displeased with them," and said that "they were all very easy."

The testimony concerning Dunphy's condition during the period following his advent at the defendant's flat was such as to justify the inference that his mental capacity, so far as it depended upon his freedom from the influence of alcohol, did not improve during the time of his residence with the defendant. It was testified to that on the twenty-sixth day of June, he was under the influence of liquor, and "was tapering off." On the twenty-seventh he was intoxicated, and on the twenty-eighth, the day on which the original complaint was filed, he was in a state of helpless intoxication. On the same day, he returned to defendant's flat, remained there two days, during which he did not become sober, and then left with his nurse for Paraiso Springs. After having been at the springs a few days, he again became intoxicated, and remained so until the seventh of July, when a friend of the defendant appeared, and brought him back. He arrived at the defendant's flat on July 9th and remained there until the twenty-first or twenty-second of July, when he finally left the defendant. While there is a conflict of testimony on this point, the trial court had before it enough to justify the conclusion that he did not regain a condition of complete sobriety during this period.

Under this showing, we think it cannot be said, as matter of law, that the evidence was not sufficient to sustain the trial court in its finding that Dunphy was incompetent, mentally, to contract marriage, and that his incompetency continued while he was cohabiting with the defendant. His excessive indulgence in alcoholic drink, persisted in for so many years; the testimony of qualified experts regarding the effect upon the mind of such excess; the evidence of irrational and peculiar conduct; the unusual circumstances attending the marriage; the fact that the ceremony took place in the midst of

a prolonged debauch or "spree" and that he continued to be more or less affected by liquor while he remained with the defendant; the actions of the plaintiff indicating a want of proper understanding of the relation and obligations of matrimony; the opinions of many reputable persons, who, after an intimate acquaintance with Dunphy, thought he was of unsound mind—all of these considerations, taken together, made a case which vested in the trial court the power of drawing an inference, conclusive upon the appellate court, of the soundness or unsoundness of the plaintiff's mind. That a finding contrary to the one made would find adequate support in the record is beyond question. But, even though we might think, on a mere reading of the transcript, that the preponderance of the evidence was with the appellant, we would not be authorized to overthrow the finding. As we said at the outset of this discussion, the determination of the trial judge on issues of fact is binding, unless it be without substantial evidence to support it. It does not lack such support here.

The other points urged for reversal require but brief consideration. There was no error in appointing a guardian *ad litem* for plaintiff. Such appointment on behalf of an insane or incompetent party may be made "when it is deemed by the court in which the action or proceeding is prosecuted, or by a judge thereof, expedient . . ." (Code Civ. Proc., sec. 372.) The order was made on the application of a relative, as provided by section 373 of the Code of Civil Procedure, and there was evidence tending to show that plaintiff was incompetent.

It is also claimed that the court erred in permitting an amended complaint to be filed. The granting of leave to file amended pleadings is a matter peculiarly within the discretion of the trial court. There is nothing to indicate that the discretion was abused in this instance.

The appellant suggests that the court erred in failing to find upon certain issues. But we think these issues, so far as they were material, were met by the findings which were made

The judgment is affirmed.

Angellotti, J., and Shaw, J., concurred.

Hearing in Bank denied.