[Civ. Nos. 2644, 2645.   Fourth Dist.—May 15, 1941.]

LEVI J. BURGESS, an Incompetent Person, etc., Appellant, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), Respondent.

(Two Cases.)

Warner I. Praul, Paul D. McCormick and A. I. McCormick for Appellant.

Jennings & Belcher for Respondent.

MARKS, J.—Plaintiff, by the regularly appointed guardian of his person and estate, commenced two actions to recover stock, or its value if redelivery could not be had, which had been pledged to secure promissory notes evidencing loans

made by defendant. The cases were consolidated for trial. Separate findings and judgments for defendants were filed and separate notices of appeal were given. There are two clerk's transcripts and one reporter's transcript. While the appeals were pending in the Supreme Court they were consolidated. Where necessary, we will refer to the action involving the pledges of stock prior to August 1, 1937 (Civ. No. 2644), as the first case, and to the one involving pledges made after September 1, 1937 (Civ. No. 2645), as the second case.

Prior to about 1930 Levi J. Burgess was a man of intelligence, education and culture. His wife and only child had died so that he had no immediate dependents. About that time he contracted an illness which, in its progress, prayed on his nervous system and finally caused general paresis of the brain. He was partially paralyzed, was tactiturn and talked very little, usually only to answer remarks or questions directed to him, and then very briefly, except when he asked for food. However, in a limited way he could carry on a conversation. He had little memory, walked with a shuffling gait and required constant attendance. Both medical and lay witnesses pronounced him of unsound mind and insane in 1937. There can be no question of the fact that his mentality was very low at that time. Hermine Nau, his guardian, who was also his niece, testified that he had the mental capacity of a child of about the age of six years.

Levi J. Burgess met Raymond Feldhaus, a young man, in about 1929, and became attached to him. It is probable that Levi intended to adopt Raymond, but this was never done. The two lived together until late in 1937. Raymond took the name of "Burgess" and was generally regarded as a son. Levi usually spoke of him by the designation of "son" or "boy".

Raymond gradually assumed complete charge of Levi's modest fortune of a value between fifty and sixty-five thousand dollars. The two maintained a joint bank account before moving to California, but after arriving in Hollywood there was but one bank account. This account was in a branch of defendant bank in Hollywood, in the name of Raymond J. Burgess. Raymond also had possession of all Levi's securities.

Raymond had no property and no income of his own. For a number of years he devoted all his time to the care of Levi and was supported out of his income. He collected all of the income from Levi's property and paid all the bills. Just when Levi's mental faculties had deteriorated to the point of making this supervision advisable does not appear, but it is probable that this occurred several years prior to 1937. There is no intimation that prior to 1937, Raymond had failed to honestly administer his trust.

Miss Nau visited her uncle on occasions. She lived with him in his apartment in Hollywood from the latter part of December, 1936, to early in May, 1937. In March, 1937, there were unpaid bills that Raymond did not have sufficient money to meet. One was a $114 balance due on the purchase price of an automobile which was used for Levi's benefit. The legal owner threatened to repossess the car if the delinquent instalments were not paid. One month's rent on the apartment, ninety, or ninety-five dollars, was in default, and the rent for the current month was past due. There were other pressing unpaid bills bringing the total, according to Miss Nau, to a sum of about $300. That it exceeded that amount is made evident by the addition of the sums due for rent and on the purchase price of the automobile.

In the presence of Levi, Raymond discussed with Miss Nau the necessity of borrowing money from the bank to pay these bills. Miss Nau testified concerning this conversation in part as follows: "Q. Yes. Well, now, as a matter of fact, in that conversation, you, yourself, told Levi about the necessity of getting the money to pay these bills, didn't you? A. I don't remember exactly what I said to him. I think that I said to him, 'Levi, Ray owes a lot of money', something like that; I don't remember the exact conversation. Q. Well, didn't you tell Levi what it was for? A. Yes, I did. Q. Told him it was for rent on the apartment where Levi was living, didn't you? A. Yes, I think that was discussed in front of him. Q. And that there were other bills that this money had to be borrowed for, didn't you? A. Yes. Q. And you told those things to Levi Burgess yourself, didn't you? A. Yes, I did, but Ray also did. I mean, it was a discussion between Ray and myself in front of Levi. Q. And also to Levi, wasn't it? A. Yes, that is correct. Q. The situation was explained to Levi Burgess himself, wasn't it? A. Not

fully. Q. Well, the fact that the bills were owing for rent and on the car, and for the other purposes, was explained to Levi, wasn't it? A. As I remember it, the statement was made that bills were owing, but I don't know whether they were specified, I can't tell you that, in front of him, I don't remember that. Q. Now, in your opinion of Mr. Burgess's mentality at this time, when the necessity of borrowing money was explained to him, he understood it, didn't he? A. No. . . . Q. Well, if you told him it was necessary to borrow money, in your opinion, he would understand that it was necessary to borrow money, wouldn't he, in your opinion? A. Yes, he would understand just exactly, he would hear you say those words, and he would know that you said them, but he would not understand fully. . . . Q. But when you explained to him that it was necessary to borrow money, you are satisfied that he understood what you were telling him, isn't that true? A. Yes, in a sense. Q. Yes. Now, as a matter of fact, Miss Nau, at that time did not Levi Burgess indicate that he understood that it was necessary to borrow money? (No answer.) Q. Didn't he so state that he understood that it was necessary to borrow money? A. He might have. I cannot recall the words of the conversation. He might have said yes. . . . Q. Yes, if you had told him that this was an instrument in connection with the borrowing of money, he would have understood what you told him in that respect, wouldn't he? A. He would have understood what you told him, but he would not have understood it by himself."

Miss Nau also testified that she knew that stock belonging to Levi Burgess was going to be deposited with the bank for the purpose of securing the loan. She testified that she went to the defendant bank when the first loan was actually made; that she was standing near the teller's window but did not hear the conversation between the note teller and Raymond; that she knew a loan was being made but did not know the details of the transaction. It is perfectly clear that she withheld from the bank any knowledge she might have had, or opinions she might have entertained concerning Levi's mental capacity to enter into a contract with the bank.

This loan was made on March 20, 1937, and was for $550. A collateral note for that amount payable to defendant was signed by both Levi and Raymond. A certificate for fifty

shares of convertible preferred stock of the Goodyear Tire and Rubber Company, belonging to Levi, was pledged to secure the loan. As a part of the same transaction Levi and Raymond executed what is called an ''Authority to receipt for and receive collateral''. It was general in its terms, not confined to the then pending transaction, and provided that its ''authority shall continue in force until you have received from me/us written notice of its revocation''. It instructed the bank to recognize the signatures of either of them as duly authorized to receive, demand, receipt for or give instructions concerning the pledged securities, and ratified any and all acts done under its authority. Under the same date they signed an authorization to pay the money loaned on the note to Raymond F. Burgess, which was done. Levi and Raymond also executed a ''General Loan and Collateral Agreement'' which was very broad in its terms and was made to apply to the loan of $550 as well as to future financial accommodations. It was therein provided that the ''agreement shall remain in full force until written notice of its termination is given by each of the undersigned to the Bank''.

On April 27, 1937, the first note was renewed and increased by a second collateral note for $1100, with the same stock pledged as security. On the same day Levi and Raymond executed a written instruction to pay the proceeds of the note to Raymond. The principal and interest of the first note was paid and the balance was deposited in Raymond's account.

On May 17, 1937, a third collateral note was executed for $2,100 with the same security. The second note was paid and the balance was deposited in the account of Raymond F. Burgess on the written instructions of Levi.

On July 20, 1937, a fourth collateral note was executed for $3,100 with the same security. The third note was paid and the balance was deposited in the account of Raymond F. Burgess in accordance with written instructions signed by Levi and Raymond.

Under date of July 31, 1937, in writing, Levi instructed the bank to sell the collateral, pay the fourth note and interest together with the expenses of sale, and deposit the balance remaining in the account of Raymond F. Burgess. This was done.

These are the transactions involved in the first case, wherein plaintiff sought to recover the fifty shares of the Goodyear Tire and Rubber Company convertible preferred stock pledged to secure the four notes, or their value, if redelivery could not be had.

The second case involved three separate collateral notes and the stock pledged to secure them.

The first note was dated September 18, 1937, was for $3,000, was signed by Raymond F. Burgess, and was secured by the pledge of fifty shares of Firestone Tire and Rubber Company six per cent preferred stock belonging to Levi. On the same day Levi signed a writing authorizing Raymond to pledge the stock as security for the loan. Levi also signed an assignment of the stock in blank. Both writings were delivered to the bank with the stock and note.

The second note in this series was dated October 6, 1937, was for $3,000, was signed by Raymond F. Burgess, and secured by the pledge of one hundred shares of Owens-Illinois Glass Company common stock belonging to Levi. On the same day Levi executed an authority authorizing Raymond to pledge the stock and an assignment of the stock in blank which was separate from the certificate.

The third note was dated October 13, 1937, was for $1,000, was signed by Levi J. Burgess and Raymond F. Burgess and was secured by the pledge of one hundred shares of Proctor and Gamble common stock belonging to Levi. Levi also executed a writing authorizing Raymond to pledge the stock and a blank endorsement of the certificate.

The defendant bank is holding the three notes in the total principal sum of $7,000, which are unpaid, together with the stock pledged to secure them, which has a market value of between eighteen and twenty-two thousand dollars.

Miss Nau returned to Hollywood in November, 1937, and was appointed guardian of the person and estate of Levi on November 24, 1937. There was no prior adjudication of his incompetency.

Under date of December 29, 1937, Miss Nau gave notice of rescission of the various transactions involved in these two actions, on the ground that Levi was of unsound mind. This letter contained the following: "The said Levi J. Burgess did not to the best of the knowledge and belief of the undersigned, receive from you anything of value in said transac-

tions, nor any of them; but if such thing or things of value were by him actually received or applied to his use or benefit, the said Levi J. Burgess does hereby offer to restore the same. . . . In consideration of his offer above set forth to do equity the said Levi J. Burgess now demands of you, the Security-First National Bank of Los Angeles, the immediate possession of all his said property held by you, whether described herein or not, free of any claims or demands of yours or through you whatsoever, and if any of said property is no longer in your possession, then the said Levi J. Burgess demands that you restore to him forthwith the value thereof at the time you parted with such property.''

It was stipulated that the reasonable value of the support of Levi during the period covered by the notes was $2,500. It is not questioned that all the money represented by the notes was paid to Raymond and deposited in his account in the defendant bank and that he paid all of Levi's living expenses out of this account. The account was closed on December 8, 1937, by the withdrawal of the balance of $123.76.

Both of the complaints are drawn on the theory that Levi was a person totally without understanding; that his contracts were therefore void; that he was not required to restore the money the bank had paid to Raymond under his void contracts.

The bank defended on the theory that it was an innocent holder for value in due course; that it had no notice of any infirmity in the contracts; that it had no notice of the incompetency of Levi; that while Levi may have been incompetent he was not ''a person entirely without understanding'' (Civ. Code, sec. 38), and could not rescind without restoring to the bank the value with which it had parted (Civ. Code, sec. 39).

The trial court found that while Levi was mentally incompetent in 1937, and before, he was not a person entirely without understanding; that the bank had no notice of his infirmity and was an innocent holder for value. Judgment was rendered for defendant in both cases. The bank, in the second case, was not claiming to own the pledged stock, but only a lien on it by reason of the pledges. The effect of the judgment is to permit plaintiff to recover his stock upon paying the indebtedness for which it is pledged.

The principal questions presented for decision are: (1) Are the findings that Levi, while incompetent in 1937, was not a person entirely without understanding, supported by the evidence? (2) What is the legal effect of such findings, if so supported, on plaintiff's right to recover his stock without restoring the value with which the bank had parted?

██ In approaching the question of the sufficiency of the evidence to support the findings to the effect that Levi Burgess, while a person of unsound mind, was not entirely without understanding, it should not be out of place to make the following observations.

Levi Burgess was undoubtedly in a debilitated mental condition.. Had the trial court found that he was a person entirely without understanding, it is probable that we would be compelled to hold that the evidence supported such a finding. However, no such finding was made, and we are required to disregard conflicts in the evidence and accept as true evidence supporting the findings and judgments. We are also required to draw all reasonable inferences from the evidence which tend to support the judgments. (*Mah See* v. *North American Acc. Ins. Co.,* 190 Cal. 421 [213 Pac. 42, 26 A. L. R. 123].) As was said in *Nielsen* v. *Frank,* 117 Cal. App. 117 [3 Pac. (2d) 607]:

"A judgment will not be reversed when there is substantial evidence supporting the findings (2 Cal. Jur., Appeal and Error, sec. 543, p. 921), or where different inferences might rationally be drawn therefrom (*MacDermot* v. *Hayes,* 175 Cal. 95 [170 Pac. 616]), even though there might be an honest difference of opinion as to the effect of the evidence. (*Estate of Presho,* 196 Cal. 639 [238 Pac. 944].) The same rules apply to the determination of the question of the mental capacity; and the findings of the trial court can be overthrown only when they totally lack the support of substantial evidence (*Dunphy* v. *Dunphy,* 161 Cal. 380 [Ann. Cas. 1913B, 1230, 38 L. R. A. (N. S.) 818, 119 Pac. 512].)"

██ It should be borne in mind that the defendant bank had no notice or knowledge of any kind as to the mental condition of Levi. It acted in good faith in all of the transactions and parted with its money in the ordinary course of its business and in honest reliance on the good faith of the person with whom it was dealing and on the signatures of Levi and

the security of his pledged stock.  Had Raymond Burgess been honest instead of being faithless to the confidence reposed in him, this case would not be here.  Miss Nau cannot escape a suspicion of blame.  She knew that Raymond was without property or income and that his signature on the note of March 20, 1937, gave no promise of the repayment of the loan.  She knew that a loan was to be made and that the only signer of financial responsibility on the note was Levi and that his stock gave the only other security for the loan.  She went to the bank with Raymond when the note and stock were delivered and the money paid to him.  She now maintains that Levi was a person entirely without understanding at that time.  Possessed of that knowledge, which she now says she had, she stood by and saw the bank accept the note and the pledged stock without informing it of what she now solemnly says was the true condition of Levi's mind.  This fact might well have suggested to the trial judge the thought that her silence at the time the loan was made did not correspond with her testimony on the witness stand.  (*Michener* v. *Hutton,* 203 Cal. 604 [265 Pac. 238, 59 A. L. R. 480].)  If this seeming conflict caused him to doubt those portions of her testimony which pointed to the total mental incapacity of Levi, it placed in question much of her testimony upon which plaintiff must rely on this appeal.  Further, there may be a reasonable inference drawn from her actions and silence on March 20, 1937, to the effect that she then believed Levi to have possessed sufficient mentality to enter into a binding contract with the bank, which inference we are required to draw and which tends to support the findings and judgment.

The dividing line between mental incompetency in a general sense, and that mental incompetency that renders a person entirely without understanding, is sometimes difficult to draw.

In *Jacks* v. *Deering,* 150 Cal. 272 [88 Pac. 909], the trial court found that Maria T. Divine, who had executed a mortgage and promissory note, "was then, and for several years prior thereto had been, physically very infirm; that at the time of the execution of the promissory note and mortgage her mental capacity had become greatly impaired, such impairment having commenced and continued several years prior to that time; that she was then a person of unsound mind, *but was not entirely without understanding,* nor had her in-

capacity been judicially determined; that at the time of her execution of the said promissory note and mortgage *she did not have sufficient mental capacity to understand the nature, purpose and effect of the transaction* in which she was engaged, or of the promissory note and mortgage; . . . " This finding was held sufficient to support a judgment foreclosing the mortgage as against the defense of its being void as executed by a person entirely without understanding.

In *San Francisco Credit Clearing-House* v. *MacDonald*, 18 Cal. App. 212 [122 Pac. 964], it was said:

"It would seem, therefore, that a person may be insane in the general acceptation of the term, and yet his insanity may be of such a character as not to deprive him entirely of the power of knowing and understanding the nature of ordinary business transactions, and that such form of insanity, or rather unsoundness of mind, will not render a person legally incapable of entering into a valid contract. (*Motley* v. *Head,* 43 Vt. 631 [633]; *Dennett* v. *Dennett,* 44 N. H. 531 [84 Am. Dec. 97].)

"It follows that if Gage was not, as the trial court found, so far insane at the time of the compromise as to be considered a person entirely without understanding, he in person would have been legally capable of conducting and completing negotiations for the settlement of his claim against the defendant, and, as a matter of course, that which Gage could do in person might also be done by his agent and attorney in fact."

Levi Burgess had not been adjudged an incompetent at the time any of the documents were signed. A careful review of all the evidence, some of which we have summarized, together with the reasonable inferences to be drawn from it, must be held to support the finding to the effect that Levi was not a person entirely without understanding when the documents here in question were executed by him.

We must next proceed to a consideration of the effect which the finding that Levi, while a person of unsound mind, was "not entirely without understanding", had on his right to rescind and his duty to restore the value with which the bank had parted in reliance on his contracts. His right to rescind cannot be questioned. His duty to restore is fixed by the provisions of section 39 of the Civil Code and the other code sections therein referred to.

Plaintiff argues that he is entitled to rescind; that he is not required to restore anything because he received nothing from the loans. This argument is based on a misconception of the admitted facts as it was stipulated that Levi's living expenses during the time involved amounted to $2,500. A considerable part of this sum undoubtedly found its source in some of the loans.

Were it necessary to do so we might be justified in concluding that Raymond acted as Levi's agent in the transactions with the bank and in receipt of the money it loaned. The documents signed by Levi suggest agency. Raymond had handled Levi's affairs and all his property and income and had paid all his bills for several years prior to 1937. While it does not appear just when this control began, it does appear that Levi's mental malady was a progressive disease and it is not unreasonable to assume that it commenced before Levi's mind had deteriorated to the extent described in 1937.

Agency, like any other fact, may be proved by circumstantial evidence. Here the circumstances in evidence and the conduct of the parties over a number of years point to the relation of principal and agent between Levi and Raymond. Of course, a principal is bound by the acts of his agent within the scope of his authority and payment to an agent is in law payment to the principal.

The question of agency was suggested during the arguments. The only reply attempted is that the contract of agency, like any other, is subject to rescission by an incompetent person. While this is true, the mere right of rescission does not change the obligation to restore those things which the principal received through the agent while the relation existed, if the principal was not a person entirely without understanding.

Defendant's arguments in support of the judgments are made under the provisions of section 39 of the Civil Code and the provisions of that code in the chapter on Rescission, and are based on the findings, conclusive here, that Levi, while a person of unsound mind, was not entirely without understanding during the time here involved, his incapacity not having been then judicially determined. Defendant maintains that plaintiff cannot escape the obligations of his contracts without restoring the value of that with which defendant had parted in entering into them. This is in accordance

with the law in California in a case where, as here, the incompetent is not a person entirely without understanding. The rule is clearly stated in 14 Cal. Jur., page 339, as follows:

"Sections 38 and 39 of the Civil Code are enacted for the benefit and protection of incompetent persons and may not be invoked by persons dealing with them. The right to rescind is conferred solely upon the incompetent or his representative. And even where a person entirely without understanding makes a contract beneficial to him, the law supplies or presumes the existence of the requisite capacity, or for his protection estops the other to set up and sustain this objection. In case of a person not entirely without understanding, a suit for a rescission may be brought, or the contract may be rescinded by the act of the party himself. But in accordance with the general rules, he must restore everything of value received, or offer to do so."

In *McNeese* v. *McNeese*, 190 Cal. 402 [213 Pac. 36], the Supreme Court said:

"Under section 1691 of the Civil Code two requirements are set forth as necessary to effect a rescission by the act of the party:

" '1. He must rescind promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability and is aware of his right to rescind; and

" '2. He must restore to the other party everything of value which he has received from him under the contract; or must offer to restore the same upon condition that such party shall do likewise, unless the latter is unable or positively refuses to do so.' " (See *More* v. *Calkins*, 85 Cal. 177 [24 Pac. 729]; *Hellman etc. Bank* v. *Alden*, 206 Cal. 592 [275 Pac. 794]; *Sharp* v. *Mortgage Security Corp.*, 215 Cal. 287 [9 Pac. (2d) 819]; *Winstanley* v. *Ackerman*, 110 Cal. App. 641 [294 Pac. 449]; *Neale* v. *Sterling*, 117 Cal. App. 507 [4 Pac. (2d) 250].)

The legal effect, if not the form, of the judgment in the second case is in accordance with these rules and permits plaintiff to recover his pledged stock by paying the amounts he owes defendant. This is true because defendant is claiming, not the ownership of the stock, but only the liens upon it by virtue of the pledges. When the debts are satisfied, the stock will be released to plaintiff.

█ Plaintiff complains of the refusal of the trial court to permit him to introduce evidence tending to show that Raymond had used much of the money obtained on the notes for his own personal purposes without any benefit flowing to Levi from such expenditures. This evidence was offered while plaintiff was contending that Levi was a person entirely without understanding and before that issue had been decided to the contrary. This evidence probably was competent at the time it was offered, because a person entirely without understanding is only "liable for the reasonable value of things furnished to him necessary for his support or the support of his family". (Civ. Code, sec. 38.) When the court decided that Levi was not a person entirely without understanding, the error, if any, became harmless, because then Levi was required to restore all that the bank had advanced and not merely the portion of it which had been used to provide him with the necessaries of life. Further, the proffered evidence was merely cumulative. It was stipulated that $2,500 would have provided Levi with the necessaries of life during the time here involved. Raymond received over $13,000 on the notes and from the sale of the pledged stock. From this it is perfectly clear that he must have been faithless to his trust and must have used much of the money for his own purposes.

The judgments are affirmed.

Barnard, P. J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 11, 1941.