## LITTREAL v. LITTREAL et al.

Court of Appeals of Kentucky.

Dec. 5, 1952.

Leonard S. Stephens, Whitley City, for appellant.

R. L. Brown, Williamsburg, for appellee.

MOREMEN, Justice.

This appeal is prosecuted from a judgment which annulled a marriage between appellant, Dovie Littreal, and James B. Littreal. Walter Brown, committee for James B. Littreal, was joined as a defendant, but, herein, we will use the word appellee to designate James B. Littreal.

In December, 1944, appellee was adjudged by the Pulaski County Court to be an incompetent. No exemplification of these proceedings is in the record, so we do not know into which of the three classifications outlined by KRS 387.010, appellee was placed. The fact that there had been an adjudication is shown only by allegations and admissions in the pleadings and rather terse statements of witnesses—all of which were general in character.

The couple had known each other for four or five years before the wedding. Appellee was a veteran of the Spanish-American War and his disability was rated by the Veterans Bureau at one hundred per cent for which he received a pension of $261 per month. He had suffered a paralytic stroke. One leg had been re-moved. The use of one of his arms was greatly impaired, and the paralysis extended to the facial region. His speech was affected. The bride, who had been married several times before, was 64 years of age; weighed 95 pounds; had little education; suffered from rheumatism and was able to do little work other than that required by her house and garden.

On December 20, 1946, the appellee, a hopeless cripple, was carried to a taxicab, where he joined appellant, and they were driven to Rossville, Georgia, where they were married. After the ceremony, they returned to Whitley City. Shortly thereafter, appellant learned that appellee's pension was being administered through Mr. Brown, his committee, who purchased for them, out of the funds in his care, a small residence near the city.

For some time their marital relationship seemed to be endurable. Appellant did the housework and raised a garden. Appellee required considerable care and she gave attention to his needs. He could feed himself all right with his good hand, but, she testified, "I had to roll him to the table and lift him in and out of bed and lift him over the slop jar." Appellee liked to drink beer with his friends, but there was no showing that he drank to excess, or even that his wife, an abstainer, objected to the practice. It is mentioned only because counsel seems to have emphasized it.

They lived together (not without interruption) until March, 1949, at which time appellee departed. Appellant testified that appellee's daughter carried him away; that "she came there in a truck and hauled him to her house. There wasn't any trouble between me and him. I asked him not to go and he just went on."

After that she stayed on at the little house and the committee gave her $30 per month living expenses. She had some difficulty living on this amount. Sometime after the separation, the committee requested that she surrender possession of the house.

On July 21, 1949, appellant filed suit for separate maintenance and for an order that the home be set aside for her lifetime use. The committee filed answer and counterclaim which stated that the separation was caused by cruel treatment inflicted upon

appellee and, further, that because of appellee's mental condition the marriage ceremony was void under the laws of both Georgia and Kentucky, and was against the public policy of the latter. It was prayed that "the marriage relation heretofore existing between plaintiff and defendant, Littreal, be declared void from its inception, and that said marriage be set aside, annulled and held for naught." The chancellor granted that prayer.

Appellant contends, first, that the court erred in his finding that appellee did not have sufficient mental capacity to enter into a contract of marriage.

In Cook v. Cook, Ky., 243 S.W.2d 900, 901, we said:

> "In determining whether one has mental capacity sufficient to contract a valid marriage, the test usually applied is whether there is a capacity to understand the nature of the contract and the duties and responsibilities which it creates. Gellert v. Busman's Adm'r, 239 Ky. 328, 39 S.W.2d 511; Dunphy v. Dunphy, 161 Cal. 380, 119 P. 512, 38 L.R.A.,N.S., 818; Payne v. Burdette, 84 Mo.App. 332."

That rule requires a consideration of the evidence introduced on this point and the various legal presumptions raised by that evidence. In the first place, the very fact that a ceremony was performed raises a strong presumption that the marriage was valid because the law jealously guards the sanctity of the marital state and resolves most doubts in favor of its validity. On the other hand, the finding at the inquest raises a presumption of incapacity. But this presumption also is only conclusive at the time of the inquest. Dowell v. Dowell, 137 Ky. 167, 125 S.W. 283. It constitutes only prima facie evidence and, being a presumption, may be repelled by proof. Wathen v. Skaggs, 161 Ky. 600, 171 S.W. 193. We are not too sure that the inquest in this case raises any presumption because, as we have said, no proof was offered as to the exact nature of the inquest. It is entirely possible that appellee was adjudged incompetent to manage his

estate because of his physical infirmities. KRS 402.020 does not prohibit the marriage of incompetents, it only denies the right of marriage to idiots and lunatics.

In any event, we believe that this case may be decided by the determination of whether the chancellor had sufficient evidence upon which to base the decree of annulment.

The only evidence introduced in behalf of appellee to sustain the position that he was mentally incompetent was: (a) the adjudication; (b) testimony of the committee that he believed him to be unsound; and (c) testimony of Dr. W. M. Cox that appellee had a mind equal to that of a six year old. Ordinarily such testimony would be highly persuasive but Dr. Cox, the first time he testified, stated that he had not seen appellee for eight or ten years. In a subsequent deposition he stated that he had examined appellee twice since he last testified and that in his opinion he did not have the mental ability to understand the obligations created by the marriage contract. The trouble with this testimony is that it does not give us a true picture of his condition at the time of the marriage ceremony in 1946, and we are concerned with his condition on that day only. It must be remembered that this minimum amount of evidence is being introduced to overcome the strong presumption of the validity of the marriage.

To support the presumption of the validity of the marriage, we have the testimony of Dr. W. L. Pyle who had treated appellee not long after the marriage and who stated that his mentality was good. In response to a question as to whether appellee had the mental capacity to understand the obligations of marriage, Dr. Pyle replied, "He talked as if he did, with sound, sensible mind and understanding." Appellant testified that although appellee was infirm and required almost constant nursing, she saw no indication of mental disturbance. Various neighbors who knew appellee were of opinion that he had a sound mind. In view of this testimony we believe the chancellor erred in holding that the

250

presumption of a valid marriage was overcome.

The foregoing decision eliminates our duty to discuss other points raised, which questions are reserved.

 A consideration of all the evidence indicates that appellee abandoned appellant with little or no cause. We believe that she is entitled to an allowance for maintenance. The trial court, because of his finding that the marriage was void, made no determination of this matter.

The judgment is therefore reversed in order that a determination of maintenance be made and for proceedings consistent with this opinion.