[Civ. No. 17938.   First Dist., Div. One.   Mar. 26, 1959.]

OSCAR G. GOLDMAN, Respondent, v. CHARLOTTE L. GOLDMAN, Appellant.

Joseph T. Curley and Marvin C. Hix for Appellant.

Charles Bagby and John F. Foley for Respondent.

WOOD (Fred B.), J.—Defendant appeals from a judgment annulling the marriage of the parties upon the ground that defendant was of unsound mind at the time of the marriage.

█ (1) *Was the finding insufficient because it declared that defendant "was of unsound mind" at the time of the marriage and "incapable of legally consenting to" the marriage? No.*

Defendant claims this finding was insufficient because it failed to specify the particular type of unsound mind here required, the lack of sufficient mental capacity to understand the nature of the marriage contract and its duties and responsibilities.

It is not necessary to specify with such particularity either in a pleading or in a finding on this issue. The statute is not that specific. It uses merely the words "that either party was of unsound mind." (Civ. Code, § 82.) A pleading in substantially the same words as those used in the finding in this case was treated as sufficient in *McClure* v. *Donovan,* 33 Cal.2d 717, 732 [205 P.2d 17]. Findings as well as pleadings should state ultimate facts. The test in either case is the same. (24 Cal.Jur. 969, Trial, § 203, note 15; 2 Witkin, California Procedure, p. 1843, Trial, § 112; and cases cited in each.) Using that test we deem the questioned finding sufficient.

█ (2) *Does the evidence support the finding of unsoundness of mind and lack of capacity to consent to the marriage? No.*

The marriage was solemnized on the 18th of June, 1943. Defendant was committed to Agnew State Hospital in March of 1950 and has remained there ever since except for a period of two months when she was paroled to one of her sisters. Plaintiff filed this action on July 16, 1956.

Three witnesses gave evidence tending to support the questioned finding. A summary of their testimony follows.

Plaintiff testified that about four months before the marriage he had discussions with defendant about the purchase of a home. He asked her aid in making a selection but her attitude was one of great indifference. She gave him no suggestions as to what she wanted. She had no ideas for him to carry out. When looking at possible homes she did not indicate what she liked or did not like. The same occurred in selecting furniture and furnishings for the home. She would just shrug her shoulders and say, ''Well, I don't care.'' She exhibited an attitude of total indifference. Upon their wedding day they agreed to meet at a bus station at a certain hour and take the bus to the place where the marriage was to be solemnized. She did not show up until about an hour after the time appointed. She gave no explanation why she was late.

At first they occupied the same bed. After three or four months she would prevent his sleeping by vibrating the bed, jumping up and down on it while he was trying to sleep. He would remonstrate and get no response. After a while it got so bad he had to use another bed. She suggested that he take the bed in their spare room, which he did.

For a period of about six months after the marriage he and she went shopping together on a Saturday and she prepared the meals. At the end of this period she refused to go shopping and to do any more cooking, and he had to do the shopping and prepare her meals as well as his own. The only reason or explanation she gave for not shopping or cooking was the remark ''Why should I?'' About four to six to eight months after the marriage she remarked that she was very unhappy in the home and wanted to move. Asked why, she said ''I consider this place a prison; I feel like I am confined. I cannot stand it.''

On several occasions she would take a paper of matches, light them and throw them on the rug and say to him she was going to burn the house down. He would then go over and step on them and she would go to her room and lock the door. She would lock herself in quite frequently.

Plaintiff's official duties required him to work until a late hour upon occasion. Upon several such occasions in 1943 when he arrived at home the doors were locked. Though he had a key he was unable to get in because the inside latch was turned. He would ring the bell and knock on the door, and nothing would happen. The latch on one of the doors was a

chain latch which he found he could open by cutting the chain with a hacksaw. On at least two occasions defendant was awake and, when asked what the problem was, laughed and said nothing. Not long after the marriage defendant falsely accused plaintiff of infidelity, of double-crossing her in everything she did and claimed that on the nights he was out at work he was not at work at all and probably was either in some political deal of some kind or out with somebody he should not be with. About two years after their marriage she denied he was married to her.

The same general situation developed between the defendant and her daughter, who was 14 years old at the time of the marriage. Defendant became critical of everything the daughter said or did. This criticism was continuous and continuously got worse. It became so bad that at one time defendant said that the daughter was not her child.

It was about one and a half or two years after the marriage when he began to suspect that defendant was mentally ill. Earlier than that he realized that there was something wrong but could not diagnose it himself. He had not had any experience with persons who were mentally ill, nor any opportunity to observe mental illness.

Defendant finally consulted a psychiatrist and was given shock treatments toward the end of 1949. After a period at a private institution she was committed to Agnew State Hospital in March of 1950.

The psychiatrist who examined defendant in the fall of 1949 and prescribed electric shock treatments testified that his initial diagnosis was a depression. After the shock treatments his diagnosis was schizoaffective psychosis, which he described as "a combination of dementia praecox and a psychosis combination," adding that to the layman it signifies insanity. It is not a disease of sudden onset, "the very meaning of the term 'schizo' means gradual onset." He further testified that on the basis of information given him by the plaintiff in 1949 and information some one gave to a physician at the hospital when she was admitted for shock treatments, she was showing inappropriate and withdrawn disinterested behavior developing over a period of many years. Upon the basis of this and other information thus furnished, the witness said it would be consistent to say that the ailment "started back some several or many years before I saw her in 1949." This was a long standing condition at the time he saw her. Asked if in his opinion the defendant was of unsound mind

on June 18, 1943, the witness said it was his opinion that "she was not mentally healthy at that time, that this ailment for which I treated her had started at the time of or at the termination of her first marriage, which I presume would go back before 1940 . . ." From information made available to the witness, he expressed the opinion that defendant was already becoming somewhat withdrawn and disinterested in her surroundings at the time of the marriage, i.e., at that time her present illness had already begun. She was beginning to be disinterested in her surroundings, withdrawn, less active, "and that isn't a healthy state of mind." The witness did not know whether this unhealthy mental condition had at that time developed to such a degree as to render her incapable of understanding what she was doing. As late as 1949 when he saw her she was not totally out of contact with things. She still had a certain amount of understanding. She knew the day. She recognized the witness when he saw her at the hospital. She knew she was in the hospital. She wanted to go home. She was oriented as to time and place.

Defendant's daughter, who was born in 1929, testified that she shared a room with her mother prior to the latter's marriage to plaintiff. Beginning in about 1935 or 1936 her mother would laugh and mumble to herself in the dark and would have sudden alterations in mood. The witness could remember being awakened at night and her mother would be laughing and kind of mumbling, talking to herself. Her mother seemed rather withdrawn a lot of the time and then would suddenly become very cheerful and make some very cheerful remarks. By "withdrawn" the witness meant "sort of day-dreaming and far away."

After the marriage the daughter was attending high school and would get home from school at about 4 o'clock in the afternoon. Many times her mother would be sitting at the kitchen table writing shorthand notes, drawing little faces on a piece of paper, not really doing much of anything, just kind of passing the time away in that manner. She would read newspapers and read things into the newspaper articles. On one such occasion the mother said "Frank [defendant's brother] did that" and upon another occasion, "How much did Russell [defendant's first husband] pay Oscar [her present husband] to marry me?" On such an occasion the daughter would say "Mother, what do you mean?" "Well, I know what is going on," would be the response. Asked what she meant, defendant would leave the kitchen and go into her room and

108

lock the door. The witness said ''Mother would never say anything that you could get at. I would question her and I know we would both end up in tears. I would say [to] her, 'Mother, what are you talking about?' and she would say, 'Well, I know what is going on and I know what it is all about' and I can recall I was very frightened about what was happening, but I didn't know what was happening.'' Her mother cried very frequently, ''just about every day.'' The daughter would come home from school in the afternoon and the mother would come out and say ''what is going on?'' and the daughter would say ''I don't know what you mean, 'what is going on' and I would say, 'There is nothing going on.' You have got a nice house and we are happy,'' and then the mother would start to cry and the daughter would cry and ''there was just a constant turmoil in that respect.'' That took place over a long period of time, starting in the daughter's first or possibly second semester at high school. She started high school in August, 1943. One time in 1945 or 1946 she saw her mother light some matches. It was in the living room. There were matches on the floor. Plaintiff stepped on them to put them out and defendant went back to her bedroom. Asked if, in her opinion, her mother was sane or insane on August 18, 1943, she replied: ''I would say definitely she wasn't sane.'' A motion to strike this answer for failure of the witness to give the reasons for her opinion was denied. Upon cross-examination she was asked why she thought the defendant was insane ''on the date of marriage.'' The witness replied: ''. . . when I was even a little girl, Mother was a very upset woman, very upset . . . she was very withdrawn and you could never really pin her down to anything and there was that idea of kind of talking to herself at night, and she was so bitter against men . . . Mother was a very withdrawn person.'' The witness was not sure whether her mother was asleep or awake when talking to herself at night. On one occasion in her testimony she said she did not know, and upon another occasion she said she did not think her mother talked in her sleep.

From this evidence the trial court concluded that at the time of the marriage defendant lacked mental capacity to understand the nature of the marriage contract, its duties and responsibilities. The question before us is whether or not this was enough evidence, substantial evidence, to justify that conclusion. Any of it that may be subject to differing inferences must be read in the light most favorable to the plaintiff, the prevailing party below. In such an inquiry we are not to

consider evidence unfavorable to the trial court's finding. Such evidence merely created a conflict which the trier of the facts resolved in favor of the plaintiff. (*Dunphy* v. *Dunphy,* 161 Cal. 380, 384 [119 P. 512, Ann.Cas. 1913B 1230, 13 L.R.A.N.S. 818]; *Estate of Teel,* 25 Cal.2d 520, 527 [154 P.2d 384].)

In ascertaining whether or not the favorable evidence furnished substantial support for the finding of incapacity, we must bear in mind that the day of the marriage is the critical date for determination of lack of capacity. It may, of course, be determined from proof of the party's condition before and after that date. (*Vitale* v. *Vitale,* 147 Cal.App.2d 665, 669-670 [305 P.2d 690]; *Williams* v. *Williams,* 63 Cal. App. 482 [218 P. 783].)

We must also bear in mind that the "presumption is always that a person is sane . . . Insanity exists as a matter of law only from the time it is shown to exist and proof of subsequent insanity will not create nor carry a presumption of its past existence . . ." (*Estate of Perkins,* 195 Cal. 699, 703 [235 P. 45].)

The psychiatrist's diagnosis in late 1949, the determination made at the time of defendant's commitment to the state hospital in March, 1950, and her continuation at the hospital constitute substantial evidence in support of an inference that the defendant lacked the requisite mental capacity as early as the latter part of 1949. But that does not take us back to the date of the marriage, June 18, 1943.

Nor was the psychiatrist, upon the basis of his 1949 diagnosis (aided by some information concerning the history of the case) able to formulate an opinion as to defendant's capacity at the time of the marriage. The most that he could say was that in his opinion she was "not mentally healthy at that time"; her ailment had started; her illness had already begun; she was beginning to be disinterested in her surroundings, withdrawn, less active, not a "healthy state of mind"; but he did not know whether this unhealthy mental condition had at that time developed to such a degree as to render her incapable of understanding what she was doing. This falls considerably short of being substantial evidence of a lack of the requisite capacity at the time of the marriage, especially in the face of the presumption of sanity.

This brings us to the consideration of the events which occurred and the traits that were displayed during the first year or two of the marriage. Whatever probative value those

manifestations might have, they were quite remote in time. It was not until six months and more that defendant stopped cooking and shopping. Until then, apparently she shopped and cooked as willingly and ably as any housewife might do. None of the other out-of-the-ordinary events were described as having occurred sooner than three or four months after the marriage. As to many of them, plaintiff said ''it all started to occur approximately from four to six or eight months after the marriage. I wouldn't want to definitely state it was this date or that . . .''

So, also, in respect to the post-marriage conduct of defendant as observed and told by the daughter. The events of which the daughter spoke occurred after she entered high school in August of 1943, in her first semester or possibly her second semester. Accordingly, those incidents could have occurred commencing anywhere from three to eight or nine months after the marriage. That was too remote in time, we think, to constitute substantial evidence of incapacity on the day of the marriage.

The indifference which defendant displayed when looking for a house and shopping for furniture prior to the marriage, and her unexplained delay in meeting plaintiff at the bus station on the day of the marriage, were close enough in time but had no discernible evidentiary significance as to defendant's comprehension of the nature of marriage and the duties and responsibilities of a spouse.

That leaves only the daughter's observations, prior to the marriage, of her mother's changes in mood, from daydreaming to cheerful, and talking to herself in the dark, which talking may have occurred in her sleep. Such evidence also has too slender a bearing upon mental capacity to furnish substantial support for the finding in question.

Concerning the daughter's expression of opinion, we recognize it has been said that the opinion of a layman (an intimate acquaintance) is entitled to ''some weight'' over and above ''that which would follow, as a matter of necessary inference, from the reasons assigned'' for the opinion. (*Dunphy* v. *Dunphy, supra,* 161 Cal. 380, 385.) That statement was followed by the statement that if ''those reasons furnish any logical support for the opinion declared, the opinion, in and of itself, is to be given such weight as the trial court may think it deserves.'' (P. 386 of 161 Cal.) In the instant case we do not consider that those reasons furnish logical support for the opinion given by the lay witness. We note, also, that,

when asked for that opinion, the daughter's attention was directed to "August 18, 1943," which in fact coincided with the commencement of her high school career, two months after the day of the marriage.

Although the judgment must be reversed, this is not a case for a reviewing court to direct entry of judgment for the defendant, as the latter would have us do. There was a sharp conflict in the evidence. Plaintiff might be able to make a better showing upon another trial, if one is held. He should not be precluded from undertaking to do so.

■■■ (3) *Is defendant entitled at this time successfully to urge the defense of laches? No.*

The question whether plaintiff was guilty of laches in not bringing this action until 13 years after the marriage was not raised by defendant in the trial court. It is too late for defendant to present such a question for the first time upon appeal. (*Parkside Realty Co.* v. *MacDonald,* 166 Cal. 426, 433 [137 P. 21]; *Busick* v. *Mandeville,* 80 Cal.App.2d 853, 856 [183 P.2d 362].) ■■■ Whether or not a party is guilty of laches is primarily a question of fact and within the trial court's province. (*Williams* v. *Marshall,* 37 Cal.2d 445, 455 [235 P.2d 372]; *Gump* v. *Gump,* 42 Cal.App.2d 64, 69 [108 P.2d 21]; *Taylor* v. *Marine Cooks & Stewards Assn.,* 117 Cal. App.2d 556, 561 [256 P.2d 595].) ■■■ If defendant had raised the issue below, plaintiff might have adduced a satisfactory explanation for the delay.

The judgment is reversed.

Peters, P. J., and Bray, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 20, 1959. Peters, J., did not participate therein. Schauer, J., was of the opinion that the petition should be granted.