[Civ. No. 8389. Third Dist. May 28, 1954.]

JOHN PAUL LUMBER COMPANY (a Corporation), Respondent, v. SAMUEL A. AGNEW, Appellant.

Brobeck, Phleger & Harrison, George J. Raymond and Evan Haynes for Appellant.

Falk & Falk and Charles Moore for Respondent.

VAN DYKE, P. J.—Plaintiff and respondent, John Paul Lumber Company, a Wisconsin corporation, brought this action against Samuel A. Agnew, defendant and appellant, to quiet title to certain timber lands in Del Norte County. It also asked that the court declare void and order cancelled of record certain deeds on which appellant relies as vesting title in him. It was the theory of respondent that, although these deeds purported to be those of the corporation, they were executed in its behalf by persons without authority to convey its lands. Appellant's position was, first, that these deeds had been executed by de jure officers of the corporation, duly authorized; second, that if those who executed the deeds on behalf of respondent were not de jure officers then they were de facto officers with authority to convey respondent's

lands; third, that respondent had ratified the acts of those assuming to act for it; and, fourth, that respondent was estopped to deny the validity of those acts.

John Paul Lumber Company was organized about 1890; it acquired timber lands in Wisconsin, in Florida and in California. It actively operated for many years and when its Wisconsin timber was exhausted it changed the main scene of its operations to its Florida holdings. In Florida it did not actively operate but became a holding corporation, and the activities of its stockholders thereafter were carried out through numerous corporations; one of which, the East Coast Lumber Company, was organized to cut the timber held by the John Paul Lumber Company in Florida. Respondent never actively operated in California.

John Paul was the original founder of the respondent and was succeeded in the management of corporate enterprises by his two sons. The varied businesses which the founder and his sons after him engaged in were family affairs, and it is apparent from the record that all the stock was closely held within that group. The Florida operations did not prosper. The East Coast Lumber Company suffered such financial reverses that during the depression years it went into receivership and was eventually liquidated. A. G. Paul and R. H. Paul, the sons of John Paul, and their respective families owned the stock of the various corporations and the stock of respondent in a proportion of about one-half to one family and one-half to the other, and A. G. Paul and R. H. Paul came to be the managing directors of the corporate activities. During this Florida period which extended over many years respondent was practically an inactive company—its single function being to own properties which the other corporations used in their businesses. Under the financial reverses which the Paul families suffered, the Del Norte County lands held by the respondent company became tax delinquent. This first occurred in 1926, and at that time the directors of respondent were R. H. Paul; his son, R. H. Paul, Jr.; A. G. Paul; his son, A. G. Paul, Jr.; and one T. R. Guerry. The corporation records show that in July of 1927 Guerry resigned as secretary and director, and one T. R. Bowen was elected in his stead to both offices. In January, 1928, the stockholders elected the following directors: A. G. Paul, R. H. Paul, T. R. Bowen, R. H. Paul, Jr., and F. C. Paul. T. R. Bowen became secretary-treasurer. These offices were held by him until May 20, 1929, when he resigned both offices and went to

South Carolina where he lived for about seven years. A. G. Paul, Jr., was appointed director and secretary-treasurer to succeed Bowen. In January, 1930, A. G. Paul, Jr., resigned as director and as secretary-treasurer, Marie L. Paul being elected to the office of director. So from the corporate records it appears that after January of 1930 neither A. G. Paul, Jr., nor T. R. Bowen were officers of the respondent. A. G. Paul, Jr., left Florida, went to Canada and then moved to Oregon where he lived for many years. There were neither director nor stockholder meetings of respondent corporation after January, 1930, and until October of 1947, just before the filing of this action.

The deeds by which the lands of respondent were conveyed to appellant, some conveyances being direct to him, others being made ostensibly to third parties but for appellant's benefit, were executed by A. G. Paul, Jr., signing as vice president, and T. R. Bowen, signing as secretary. The first and the last two deeds in the series of seven by which the lands in question were conveyed were executed by A. G. Paul, Jr., as vice president. The other deeds purported to be executed for him by his wife, acting as his attorney in fact and signing his name as vice president. Upon this record the court found that these deeds were not executed by de jure officers of the corporation.

There was testimony that T. R. Bowen, a distant relative of Marie L. Paul, wife of A. G. Paul, Sr., had been employed by the East Coast Lumber Company as an accountant and general handyman; that he had never had any part in the management of respondent corporation and had owned none of its stock. He, himself, testified that he handled no affairs of the respondent since his resignation as director and secretary in 1929 until 1944. By this time he was again residing in Florida near the place where respondent's affairs had been handled up to the time when it became inactive, and it appears that he became the principal actor in the transactions whereby, in 1944, the Del Norte County lands of respondent were conveyed to appellant. His activities in connection with the affairs of the respondent corporation, however, were limited to the making of the deeds to respondent's Del Norte County lands and to the receipt of the moneys paid therefor, which moneys he first deposited in bank and then transferred to his account as executor of the will of A. G. Paul, Sr., who had died in 1943. This estate was subsequently distributed to Marie L. Paul, widow of decedent. Bowen handled no other affairs for the company; indeed, the company had long been

completely inactive, and remained so until action was taken preparatory to filing this suit. As to A. G. Paul, Jr., who, with Bowen, purported to act for the corporation in the execution of the deeds, he had had no connection whatever with any of the affairs of respondent from 1930, when he had left Florida, until the execution of the first deed. At that time he was in the Navy. While on a short leave he visited Watertown, Florida, which town had been the site of operations of the John Paul Lumber Company, where his mother, Marie L. Paul, resided. At that time he saw certain correspondence having to do with Del Norte County lands, and coming from individuals who wanted to buy the properties. He talked with Bowen about the matter, told him he knew nothing about such matters, and asked Bowen if he (Paul) had any connection with respondent. Bowen told him that he was the vice president, and acting in that belief he later executed the first of the series of deeds, and the last two. His wife, to whom he had given a general power of attorney, commonly given by members of the armed services, executed the other deeds, purporting to act under this power of attorney and signing her husband's name as vice president of respondent.

Respondent's Del Norte County lands, as we have stated, became tax delinquent in 1926. They had later been tax deeded to the state and had remained in that status. In April, 1944, a Mr. Puter, who resided in the general area in which the lands were located and who was by occupation a searcher of titles, made application to the Del Norte County supervisors for the public sale of these lands. Other applications may likewise have been made. The supervisors responded by advertising the sale for July 3, 1944. Puter wrote a letter to the respondent company at Watertown, Florida, and this letter came into the hands of Bowen. In the letter Puter stated that the lands would be sold for taxes; that he had other holdings of his own near these lands; that he wanted to buy the lands and would pay $1.00 an acre for the respondent's equity of redemption. It was, of course, apparent that if the lands were not to go to public sale they would have to be redeemed before the advertised date of sale, and that meant the payment of considerable sums of money to discharge the tax liens and prevent the divestiture of respondent's interest. It actually took approximately $9,000 to clear all the land of taxes. Bowen, purporting to act for respondent, authorized Puter to redeem the lands at Puter's cost, and purported, also, to give respondent's option to Puter to purchase the

redeemed lands at the offered price. From time to time the lands were redeemed and conveyed to Puter. It is unnecessary to state in detail the series of transactions that followed. It is enough to say here that the lands were redeemed, appellant furnishing the money for that purpose and paying, in addition, the $1.00 per acre for respondent's equity of redemption. Bowen's testimony was that in all of these matters he acted in the-honest belief that he was the secretary of respondent and was acting for its benefit. As to A. G. Paul, Jr., his testimony was to the effect that his assumption to act as vice president of respondent was based wholly upon Bowen's statements to him that he did hold such office. He said he knew nothing of the details of the various transactions by which the company's property was conveyed to appellant, and that for almost the entire period during which these transactions were taking place he was serving in the Navy in distant theaters. In explanation of the actions of the two men in assuming that they had authority to convey away the respondent's lands, it was shown that the records of the respondent, and especially the minute book of director and stockholder meetings, had been lost around 1930, when a fire destroyed the building in which they had been kept, and had remained lost until in 1947 when some of these records, including the minute book, were found. In the interim none of the members of the Paul families were shown to have known anything about these records having escaped destruction in the fire.

The deeds obtained by or for appellant were all quitclaim deeds in form and were dated and executed as follows:

Deed dated June 10, 1944, executed by A. G. Paul, Jr., and T. R. Bowen, as vice president and secretary, respectively;

Deed dated July 21, 1944, executed by Bowen as secretary, and Margaret F. Paul, wife of A. G. Paul, Jr., who signed as his attorney in fact, his signature purporting to be that of vice president of respondent;

Deed dated July 28, 1944, again executed by Bowen and by Mrs. Paul as attorney in fact for A. G. Paul, Jr.;

Deed dated September 15, 1944, executed by Bowen and by Margaret F. Paul as attorney in fact for A. G. Paul, Jr.;

Deed dated October 29, 1945, executed by Bowen and by Mrs. Paul as attorney in fact for A. G. Paul, Jr.;

Deed dated May 7, 1946, executed by A. G. Paul, Jr., as vice president, and Bowen, as secretary;

Deed dated August 27, 1947, executed by A. G. Paul, Jr.,

purporting to act as vice president, and Bowen, purporting to act as secretary.

It is not seriously contended by appellant that Bowen and A. G. Paul, Jr., were de jure officers when they assumed to act for respondent, and certainly such a contention could not be sustained in view of the trial court's findings based upon the corporate records and the testimony we have narrated. We, therefore, without further discussion, pass on to the matter of their having been de facto officers.

■ A de facto officer of a private corporation is defined as being one who has the reputation of being the officer he assumes to be in the exercise of the functions of the office, and yet is not a good officer in point of law; and as one who is in possession of an office and discharging its duties under color of authority. (Fletcher Cyclopedia Corporations, perm. ed., vol. 2, § 373.) "A person is an officer or director de facto where he is in possession of the office and exercising the duties thereof under color of right, but fails of being an officer or director de jure by reason of ineligibility, irregularity in his election, or failure to qualify as required." (19 C.J.S., Corporations, § 740, headnote.) Says Fletcher, *supra*, section 374: A solitary exercise of power, even under color of title, will not constitute the party an officer de facto. To constitute such officer one must be in actual possession of the office and be exercising and discharging its functions and duties. He must hold office under some degree of notoriety, and exercise continuous acts of an official character. Says the author: "whether two claimed de facto officers are in possession and exercising the powers of their office, and claiming to hold such offices under color of an election, are questions of fact for the trial court." (See also 13 Cal.Jur.2d, "Corporations," § 294.)

In support of his contention that A. G. Paul, Jr., and Bowen were de facto officers of respondent and that respondent, therefore, is bound by that which these men did, appellant argues as follows: From April of 1944, when Puter began the first of the negotiations which resulted in the conveyance of respondent's land, until October of 1947, when steps were taken in the reesetablishment of respondent as a corporation of Wisconsin, in good standing, these men claimed to be officers of respondent. During that time seven deeds were executed under their authority and the proceeds disposed of. This was the whole of the corporation's business during the period and no one else purported to act in its behalf. No

one else claimed to be an officer of the corporation. Paul and Bowen believed they were officers, and this belief was shared by almost everyone concerned with the corporation. Marie L. Paul, widow and beneficiary of the will of A. G. Paul, Sr., believed these men were officers and likewise so did other members of the Paul families, who, among themselves, owned all of the stock. A county probate judge in Florida, who took acknowledgments to a number of the deeds, must have shared the belief that these men were the officers they purported to be. The cashier of a bank in Lake City, which is near Watertown, testified that Bowen had opened an account in his bank for John Paul Lumber Company; that it was the cashier's opinion that Bowen was then secretary and treasurer of respondent, and that, again in the cashier's opinion, Bowen was known as such around Lake City and Watertown. In the case of Bowen, he once had been the officer which he purported to be when he signed the deeds. The negotiations for these deeds began in 1944, and from then on until the discovery of the minute book in October of 1947, A. G. Paul, Jr., claimed to be the vice president, and Bowen claimed to be the secretary-treasurer of respondent and no one protested their claim, and they purported to act on behalf of respondent in those capacities. Their acts covered a period of three and one-half years during which time they carried on all of the corporation's business, and those to whom they conveyed the property accepted them as the officers they claimed to be. Appellant argues further that these two men were generally accepted within the corporation as the officers they claimed to be, and that the stockholders and surviving de jure officers knew of the acts of these men and believed them to be authorized.

We are presented here with the familiar situation where the trier of fact might have upheld appellant's contention by deciding that A. G. Paul, Jr., and Bowen were de facto vice president and secretary of respondent, but it is equally apparent that the trier of fact was not compelled to do so; in short, that the evidence, taken as a whole, did not amount to proof as a matter of law that these two men were de facto officers. The trial court had held, upon substantial if not imperative evidence, that these two men were not de jure officers. ▮ Each of them had, about 15 years before, resigned the only offices they had ever held and left the scene of respondent's operations. There is evidence that neither had ever conducted any affairs of respondent in an executive

capacity until they began acting as officers of respondent in 1944. Bowen had returned to the vicinity of Watertown, but A. G. Paul, Jr., had not appeared there except temporarily, and never did he go there with any purpose of conducting any business as an officer of respondent. Aside from the inferences that might be drawn from the testimony of the county probate judge and the bank cashier, there was no proof that Bowen had been acting as an officer of respondent before these transactions took place, and there was no proof of any specific thing that he had done which would have justified the expressed opinion of the judge and the cashier. The corporation had done no business from 1930 until these conveyances were made, and it is going far to describe the transactions ending in the conveyances as amounting to the conducting of the corporation's business. Rather, it was in the nature of a liquidation proceeding, motivated probably by belief on the part of Bowen that unless these lands were conveyed they would be lost and that it was better under the circumstances that a little should be gotten while that could be done. There seems to be no reason not to credit Bowen with having acted in what he believed to be the best interests of the Paul families. But the trial court could have disbelieved, in view of his departure from Florida and his resignation from the offices he held in respondent corporation back in 1929, that he thought he was, in 1944, an officer. As to A. G. Paul, Jr., there is testimony that any belief he may have had that he was an officer of the corporation derived solely from what Bowen told him when he got him to sign the conveyances which he did sign. The trial court could have concluded from the whole of the evidence that these two men were mere usurpers who knew, or certainly should have known had they made any inquiry or sought to revive their own memories, that they had no authority to convey away the lands of respondent. The finding of the trial court that they were not de facto officers is supported by the evidence, and is beyond attack on appeal.

Appellant further contends that if A. G. Paul, Jr., and Bowen were neither de jure officers nor de facto officers of respondent, yet their acts in conveying respondent's property were ratified by respondent.

"Whether an agent's act is binding upon his principal does not necessarily depend upon the existence of authority in the agent at the time the act was done, for an

agency may be created, or an authority may be conferred, by a subsequent ratification as well as by a precedent authorization.'' (2 Cal.Jur.2d, ''Agency,'' § 75.) (See Civ. Code, § 2312.)

However, the manner of ratification is controlled by specific code sections.

''An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing.'' (Civ. Code, § 2309.)

''A ratification can be made only in the manner that would have been necessary to confer an original authority for the act ratified, or where an oral authorization would suffice, by accepting or retaining the benefit of the act, with notice thereof.'' (Civ. Code, § 2310.)

█ A. G. Paul, Jr., and Bowen, having been neither de jure nor de facto officers of respondent, it was necessary to the creation of an agency in them to convey respondent's land that they be so thereunto authorized in writing. (*Blood* v. *La Serena L. & W. Co.*, 113 Cal. 221 [41 P. 1017, 45 P. 252]; *Blair* v. *Brownstone Oil & Ref. Co.*, 168 Cal. 632 [143 P. 1022].) There is no claim and could be none on this record that there was any precedent authorization by the respondent, and this brings into play the provisions of Civil Code, sections 2309 and 2310, that any ratification must have been by formal action evidenced by writing. █ A corporation's ratification of an alleged agent's unauthorized sale of its property can only be effected through a resolution of its board of directors when duly assembled. (*Salfield* v. *Sutter Co. L. I. & R. Co.*, 94 Cal. 546, 549 [29 P. 1105]; *Blair* v. *Brownstone Oil & Ref. Co., supra.*) We are not here concerned with the exception to the general rule mentioned in *Jeppi* v. *Brockman Holding Co.*, 34 Cal.2d 11, 17-18 [206 P.2d 847, 9 A.L.R.2d 1297], holding that the rule is not applicable where an act requiring written authorization is performed by an executive officer of a corporation. As we have already seen, the trial court properly found that the men purporting to act for the respondent were neither de jure nor de facto officers thereof and had no authority in fact or in law to represent the corporation. We hold that respondent never ratified the deeds executed in its name and that the court's finding that there had been no ratification must be upheld.

Finally appellant contends that respondent is estopped to deny the validity of the conveyances which it seeks to avoid.

This of course presents a different issue from that of ratification. The defense of estoppel was pleaded, and the first argument of appellant in support of this point of his appeal is the the court made no finding upon the issue. This is not so. The finding was general, but we think it was sufficient, in the absence of any request by appellants for a more complete finding. The court found:

"That at the time that the deeds . . . were executed neither A. G. Paul, Jr., nor T. R. Bowen were either de jure or de facto officers of the plaintiff, John Paul Lumber Co., a corporation; that in executing the deeds in question they . . . acted without office or authority and their acts in executing said deeds are not binding on the plaintiff, John Paul Lumber Co., a corporation; that there is no basis for a finding of ratification of their acts by the plaintiff, nor were there present the elements of estoppel against the plaintiff; and that all of said deeds are null and void. . . ."

The foregoing contains a sufficient finding upon the defense of estoppel in the absence of any request for findings more in detail. Questions as to the existence or nonexistence of estoppel are questions of fact for determination of the trial court. (*Parke* v. *Franciscus,* 194 Cal. 284 [228 P. 435]; *Assets Corp.* v. *Perrin Properties, Inc.,* 48 Cal.App.2d 220, 228 [119 P.2d 375].) We think that here again the evidence on the question of estoppel was in conflict, and that the decision of the trial court that estoppel had not been made out is conclusive on appeal. We have already recited some of the evidence applicable to this issue of estoppel. Additional evidence is presented by the record. Mr. Puter, who dealt with Bowen and other members of the respondent corporation, was a title man. Mr. Quinn, an attorney at law, was acting for appellant throughout as appellant's counsel. These men knew that they had no assurance or representation from anyone other than Bowen until after nearly all of the deeds in question had been executed that Bowen had any authority whatsoever, or that he was an officer de jure or de facto of respondent. Their first communication was addressed to respondent and answered by Bowen, and in his answer, acting no doubt under the pressure of the emergency portrayed in Puter's opening letter to respondent, he purported to bind the corporation to the granting of an option to Puter for the purchase of the lands. Mr. Quinn and Mr. Puter knew that respondent was a Wisconsin corporation, and if they were not familiar with the basic corporation laws of Wisconsin,

such information was readily available. Had they inquired they would, for instance, have discovered that respondent, back in 1927, had failed to make an annual report required by Wisconsin law (Rev. Stats., § 180.08), and the Secretary of State of Wisconsin had declared a forfeiture of its corporate rights and privileges. A letter to the Secretary of State of Wisconsin would have disclosed these matters and would have further disclosed that the forfeiture had never been lifted. When Bowen began to deal with them, asserting himself to be the secretary and stating that A. G. Paul, Jr., was vice president, they made no inquiry as to whether or not they were such officers or as to whether or not they had authority to convey respondent's land. They proceeded to act in redeeming lands and paying the small purchase price per acre without further inquiry. The reason for this may be found in Puter's answer when he was asked as a witness why he and his associates did not let the lands go to auction and bid them in. His reply was that if the lands had gone to auction "these big operators there would have bid the property up to a pretty high price. It would have been sold." After the first deed had been executed by Bowen and A. G. Paul, Jr., the four deeds following in point of time were executed by Bowen and by Margaret Paul as attorney in fact for A. G. Paul, Jr. As we read the record it is not even claimed that either Puter or Quinn believed that if Paul, Jr.'s signature was necessary as vice president he could delegate the signing of it to his wife through power of attorney. More than this, they were informed by Bowen that all of the men of the Paul families were in the armed forces and not available; but that there did exist this document executed by A. G. Paul, Jr., general in form and constituting his wife as attorney in fact. ▮ Without going further it can be said that from the beginning there were such indications that these deeds coming through were unauthorized, that neither Puter nor Quinn nor appellant in his turn relied or could justifiably have relied upon any representation concerning the authority of the signers of these deeds. These men seem to have taken a calculated risk. The trial court could have so determined. Appellant argues at length that the stockholders of the respondent had abandoned the corporation; that Marie L. Paul, by direct holdings and through inheritance of her husband's shares of stock, had been in fact the manager of the corporation, and that she knew of the acts being taken by A. G. Paul, Jr., and Bowen; that up until the time the cor-

porate records were discovered those members of the Paul families who were stockholders and who knew at least something of what was happening, believed that Bowen and Paul, Jr., were authorized to do what they did and made no objection to their doing it; that the corporation received and retained the purchase price of the land and was not, by the judgment of the court, required to refund it. (That the respondent corporation received the purchase price rests upon testimony that Bowen first received it, then deposited in an account he opened in the name of respondent for that purpose in the Lake County Bank, and then paid it into the estate of A. G. Paul, Sr., where it was received in payment of a debt which Bowen said the respondent owed to A. G. Paul, Sr. It should be added that appellant's funds used to redeem the lands from tax liens were by the judgment ordered to be paid into court for his benefit and there is no contention advanced that this was not done and that these funds are not available to him.) Appellant refers also to testimony that J. A. Paul, son of A. G. Paul, Sr., and brother of A. G. Paul, Jr., returned from the service late in 1945 and thereafter, acting as he said solely upon information given him by Bowen that his brother and Bowen were officers of the corporation, was instrumental at the request of appellant and his associates in bringing about the execution of two further deeds by his brother. A number of other matters reflected in the evidence are also noted in appellant's arguments on this matter of estoppel, but we think it unnecessary to relate them in detail. So far as estoppel is concerned these argued matters do no more than raise a conflict as to the existence of the various elements of estoppel. It has been said that four things are essential to the application of the doctrine of equitable estoppel. First, the party to be estopped must be apprised of the facts; second, he must intend that his conduct shall be acted upon, or so act that the party asserting the estoppel has a right to believe it was so intended; third, the other party must be ignorant of the true state of facts; and, fourth, he must rely upon the conduct, to his injury. (*City of Los Angeles* v. *Babcock*, 102 Cal.App. 571 [283 P. 314].) The trial court was not bound to hold that the respondent corporation, through any of its actual de jure officers, is to be charged with making representations to appellant concerning the authority of those who purported to execute deeds in its behalf. To the knowledge and belief

of the corporation's officers, neither appellant nor those who acted for him knew anything about it. Actually, if they relied at all upon anything emanating from anyone purporting to represent respondent, they went upon nothing and could have gone upon nothing other than Bowen's representations. Later on when J. A. Paul took action he told Mr. Quinn that all he knew about the authority of A. G. Paul, Jr., and Bowen was hearsay and he testified that his information came from Bowen alone. The factual finding of the trial court that respondent is not estopped to set up the invalidity of the deeds purportedly executed in its name finds ample support in the record.

The judgment is affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied June 22, 1954, and appellant's petition for a hearing by the Supreme Court was denied July 21, 1954. Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.