[Civ. No. 14091. First Dist., Div. One. May 16, 1950.]

ADOLPH R. CHEDA, Respondent, v. F. LLOYD GRANDI, Appellant.

Martinelli, Gardiner & Riede and A. Dal Thomson for Appellant.

Jerome A. Duffy for Respondent.

PETERS, P. J.—Plaintiff, Adolph R. Cheda, brought this action against F. Lloyd Grandi, his mother, individually and as administratrix of the estate of her son Henry E. Grandi, and Mr. and Mrs. J. D. McFadden for declaratory relief to have it determined that a certain lease on a piece of business property was valid, or, if declared invalid, then plaintiff prayed for money damages against Lloyd. The McFaddens cross-complained for back rent and possession of the premises from Cheda, and damages against Lloyd. The trial court held

that Cheda had no valid lease of the premises, but awarded him damages against Lloyd in the sum of $2,572.50. The appeal now before the court is by Lloyd from the money award against him. Cheda has also appealed from that portion of the judgment determining that he has no lease, but that appeal is not now before the court.

Cheda is in the garage business at Point Reyes Station, California. Originally, the business was operated in two separate buildings, the Codoni Garage and the Grandi Garage. He has been occupying the Grandi Garage since 1934. From 1934 to 1942, he had a month-to-month tenancy. In 1942, he decided it would be to his advantage to move all his tools and equipment to the Grandi Garage and use the Codoni Garage simply for storage. This was only feasible if pits were installed in, and an office constructed on, the Grandi Garage premises. Cheda was desirous of making this move only if he could secure a lease on the Grandi Garage.

At the inception of the tenancy of the Grandi Garage in 1934, Henry Grandi, brother of Lloyd, owned the premises. In August of 1941, Henry suffered a mental deterioration caused by chronic high blood pressure, and was confined thereafter in hospitals or sanitoriums until his death in April of 1943. He was declared incompetent in February, 1943, and his mother appointed guardian. She inherited the property upon his death.

Cheda was an old friend of the Grandi family and knew that the garage was owned by Henry. He also knew of the stroke suffered by Henry in August, 1941, and its general effect on his mind. After August of 1941, Lloyd assumed to act for his brother in connection with the garage, and in other matters. Lloyd was a real estate broker operating under the name of Marvelous Marin Realty Company in San Rafael. Sometime in February, 1942, Cheda talked with Lloyd about securing a lease on the premises. Under date of March 11, 1942, Lloyd wrote Cheda a letter offering him a five-year lease with an option to renew for an additional five years at a monthly rental of $40, and offering certain tools and equipment for $600, and providing in detail how certain back rent should be paid. The letter starts off with the following significant language: "I have analyzed the matter of your leasing Henry's garage at Point Reyes and I have attempted to arrive at a solution which would be fair to you and also to him. I have decided as follows:" There

then follows the proffered terms of the proposed lease as summarized above. The letter concludes with: "Will you please give this your immediate attention and advise at your earliest convenience." A few days later Cheda told Lloyd that the proposed terms were acceptable to him. Shortly thereafter, Lloyd prepared a lease containing the terms above described, sent three copies of it to Cheda, and requested Cheda to sign all three copies and to return them to him. Apparently, Cheda was unwilling to sign the lease as presented, and the document was redrafted by Lloyd, and again he sent Cheda three copies, requesting that Cheda sign and return all three to him. This, Cheda did. The lease provided for a signature by Henry, but Lloyd never discussed the lease with Henry, nor did he ever secure Henry's signature to it. Cheda was unaware of the fact that Henry, or Lloyd on his behalf, had not signed the lease.

Part of the agreement between Lloyd and Cheda was that Lloyd would install pits in the premises, and that Cheda, at his own expense, would construct an office. These things were done, and Cheda moved all his equipment to the Grandi Garage. Thereafter, rent was paid pursuant to the terms of the lease by Cheda, all such payments being made to the Marvelous Marin Realty Company. The lease called for a total payment of $55 per month, $40 as rent and $15 as payment on the purchase price of certain equipment Cheda was purchasing from Henry. In February, 1943, Cheda requested to be relieved temporarily of the $15 payment. Under date of February 12, 1943, Lloyd wrote to Cheda as follows: "Regarding your request to eliminate the $15.00 payment on the equipment for 1943, I am willing to accept only the $40.00 garage rent until such time as in my opinion conditions are such that the payments on the equipment should be renewed."

Cheda never saw Henry after August of 1941. Lloyd testified that he was acting for his brother in drawing up the lease, but admitted that he had never been authorized by Henry to act as his agent, and admitted that he never at any time discussed the lease with Henry. On previous occasions he had acted for Henry and for other members of the family in business matters, and was looked upon by the other members of the family as its business advisor. Before Henry's death, Lloyd deposited the rent payments received from Cheda in his business trustee account, and records were kept indicating that the money was Henry's. After Henry's death, Lloyd

continued to collect the rent and credited the same to his mother's account.

About July of 1946, the McFaddens started negotiations with Lloyd to purchase the Grandi Garage. Lloyd told McFadden that Cheda had only a month-to-month tenancy and had no lease, but Cheda told McFadden that he had a lease, but apparently did not tell him about the option to renew clause. Cheda, of course, had no copy of the lease, and Lloyd, at first, was unable to find the three copies signed by Cheda. He finally did find them and gave the McFaddens a copy, and Cheda a copy. Just when this was done is not clear from the evidence, but it was before the McFaddens paid the final purchase price to the seller. McFadden concluded that, since the lease was unsigned by Lloyd, it was not a valid lease and not binding on him. At any rate, the original five-year term was to expire on March 31, 1947, and, not knowing of the renewal clause, McFadden was willing to buy the property whether or not there was a lease. The purchase was completed and McFadden immediately raised the rent to $75 per month, effective October 15, 1946. Cheda refused to pay the increased rental, relying on the validity of his lease. This action followed.

On these facts the trial court found that at all times during the tenancy of Cheda, Lloyd held himself out to Cheda and others as the agent of his brother Henry, and "volunteered, assured and represented" himself as such; "that prior to March of 1942, said Henry E. Grandi became incompetent at times and thereafter was unable at times to manage his own affairs; at the time he actually became incompetent in the year 1941, he was known to be incompetent by the plaintiff 'Cheda,' who knew that he was unable at times to manage his affairs or his property"; that Lloyd submitted the lease to Cheda for signature with the understanding that if the lease were executed by Cheda and returned to Lloyd, the lease would be properly executed by Henry; that during the negotiations for the lease, Lloyd purported and assumed to act as the agent of Henry and represented himself as such; that Cheda relied upon these representations and believed that Lloyd was the duly authorized agent of Henry.

The court concluded that Cheda had no enforceable lease and gave judgment in his favor against Lloyd for $2,572.50 for breach of warranty of authority, the same being the difference between the $40 rental provided in the lease, and the $75 monthly rental charged by the McFaddens over the balance of the period of the lease.

Both parties to this appeal agree that the basic legal question involved is whether the evidence supports the findings that Lloyd was guilty of a breach of warranty of authority. Section 2342 of the Civil Code provides: ''One who assumes to act as an agent thereby warrants, to all who deal with him in that capacity, that he has the authority which he assumes,'' while section 3318 of that code provides that the measure of damages in such cases is ''the amount which could have been recovered and collected from his principal if the warranty had been complied with . . .''

Lloyd contends that at no time did he represent that he had authority to *execute* a lease for Henry, but contends that he simply had power to negotiate for a lease, and for that reason Cheda had no right to assume that the proposed lease had been or would be executed by Henry, or that Lloyd would execute it on his behalf. As to the letter of March 11, 1942, appellant contends that it dealt with three subjects: (1) The terms of the proposed lease; (2) back rent and (3) the sale of equipment, and that, as to the lease, the letter indicates that he was acting on behalf of Henry and therefore only had power to negotiate, but as to the other two items he was representing he had power to execute. Appellant also points out that the lease called for Henry's signature, and that Cheda believed that Henry, not Lloyd, was to sign it. Appellant claims that at no time did he represent that he had power to sign the lease, or that it had been signed. Appellant concludes that all he did was to represent that he had power to negotiate for a lease, and that, although this representation was false, such false representation did not legally injure Cheda. It is also urged that the evidence shows that Cheda was not deceived by any representation of Lloyd's because he knew that Henry was incompetent.

We think the evidence shows that Lloyd held himself out to be more than an ordinary agent with power simply to negotiate. Lloyd's letter of March 11, 1942, states that ''*I* have analyzed the matter,'' and ''*I* have attempted to arrive at a solution,'' and ''*I* have decided.'' The transaction outlined in the letter was an integrated transaction. Reasonably construed it impliedly represented that Lloyd had power to execute the lease. The subsequent actions of Lloyd strengthen this construction. It was Lloyd who collected all payments, and they were the very payments called for in the lease. It was Lloyd who granted Cheda permission to make alterations in the premises, the lease providing that such permission had

to be secured from the lessor. It was Lloyd who, by letter dated February 12, 1943, allowed Cheda to discontinue the $15 monthly payments on the equipment, and in that letter states: "*I* am willing to accept only the $40.00 garage rent until such time as in *my* opinion" etc. Lloyd admitted that he often acted as Henry's agent in real estate and other business transactions. All of this evidence demonstrates that Lloyd represented by his actions that he had authority to execute the lease for Henry. There was, therefore, a breach of the warranty defined in section 2342.

Even if the evidence did not show a breach of warranty, under the admitted facts, and under the findings, a proper case is presented to estop Lloyd from denying that he had represented that he had authority to execute the lease. Lloyd told Cheda to return all copies of the lease to him after Cheda signed them, and represented that Henry would sign them. He never told Cheda that the lease was unsigned by Henry, but immediately started to act under the lease as if it had been signed. He collected the precise rents called for by the lease. He constructed pits in the garage for Cheda. He purported to grant the consents to a modification of the terms of the lease and to alterations in the premises. Under such circumstances, while the principal Henry could not be estopped, he having made no representations, the agent Lloyd is estopped to deny that he had represented that he had power to negotiate for and to execute the lease in question.

Appellant also claims that the evidence shows that Cheda knew that the property belonged to Henry and also knew, after August of 1941, that Henry was incompetent to execute a lease. Thus, it is argued, since one mentally incompetent cannot appoint an agent, Cheda knew that Lloyd could not legally act for Henry, and was therefore not deceived. It is, of course, the law that a third party cannot hold the agent on a breach of a warranty of authority where such third party knows that the principal is incompetent and cannot appoint an agent.

The difficulty with this argument is that the evidence as to the mental condition of Henry during this critical period, and Cheda's knowledge of it, is in conflict. There was evidence that Henry became incompetent in August of 1941, and remained in that condition until his death. But there is also conflicting evidence. Lloyd testified, when asked if his brother, after the stroke, knew what he was doing: "Well, he would

be rational one day and the next day he wouldn't," and again, "He might be rational one day and not the next . . ." Cheda's testimony is somewhat confusing. On his deposition he made the general statement that in August of 1941, he knew that Henry was incompetent and unable to handle his own affairs, and that when he returned the lease to Lloyd he knew that Henry was then in no condition to sign it. But at the trial he positively testified that after August of 1941, he did not know that Henry was entirely incapable of handling his affairs. He also testified that he believed that Lloyd was going to discuss the lease with Henry; that Lloyd told him that he was going to do so, and that Lloyd told him that, in fact, he had done so. He also testified that he never saw Henry after August of 1941.

We cannot say, as a matter of law, that this evidence compels the conclusion that after August of 1941, Henry was so mentally incompetent that he could not have entered, at any time thereafter, into a contract or appointed an agent. In addition to the presumption of sanity (14 Cal.Jur. p. 362, § 19), the evidence is susceptible of the reasonable construction that after August, 1941, Henry had lucid intervals, and that he could have entered into the lease or appointed Lloyd as his agent for that purpose. (See *Burgess* v. *Security-First Nat. Bank,* 44 Cal.App.2d 808, 816-818 [113 P.2d 298].) The finding on this issue, while not as clear as might be desired, seems to be in accord with this view of the evidence. It is that prior to March of 1942, Henry "became incompetent *at times* and thereafter was unable *at times* to manage his own affairs." (Italics added.) The reasonable implication is that if only *at times* Henry was incompetent, that *at times* he was competent. That implied finding is amply supported.

It should be mentioned that even though Henry was totally incompetent after 1941, and therefore could not have appointed Lloyd his agent, that fact alone would not compel a reversal of the judgment against Lloyd if Cheda did not know of the total incapacity. While the rule is that an agent does not normally warrant the capacity of his principal to contract (Restatement of Agency, § 332), that is not an absolute rule. As stated in "Comment a" to section 332, "if the principal is completely incompetent so that he cannot be a party to a contract, the agent may be liable upon a warranty." (See, Restatement of Agency, § 329, and "Comment d" thereunder.) Lloyd's statements to Cheda that he would submit the contract to Henry, if he then knew that Henry was

totally incompetent, would be a sufficiently material misrepresentation to impose liability upon Henry upon the warranty.

The portion of the judgment appealed from by F. Lloyd Grandi is affirmed.

Bray, J., and Schottky, J. pro tem., concurred.