[Civ. No. 25984. Second Dist., Div. Four. May 3, 1963.]

EDNA L. BERAKSA, Individually and as Administratrix, etc., Plaintiff and Respondent, v. STARDUST RECORDS, INC., Defendant and Respondent; JOHN E. CROOKS et al., Defendants and Appellants.

John E. Crooks, in pro. per., and Jesse A. Hamilton for Defendants and Appellants.

Denio, Hart, Taubman & Simpson and Roger W. Young for Plaintiff and Respondent.

Samuelson, Buck & Bergmann and Robert Buck for Defendant and Respondent.

BISHOP, J. pro tem.*—This is an appeal by John E. Crooks and George W. Creveling, who, as defendants and cross-defendants, have had judgment rendered against them for various amounts on at least six different theories. We have concluded that the judgment should be affirmed.

A brief sketch of the plot forming the background of the case may contribute to an understanding of the problems presented by the appeal. There was, in the City of Long

---

*Retired judge of the superior court sitting pro tempore under assignment by the Chairman of the Judicial Council.

Beach, an eating-drinking place known as The Twin Flame Room (Flame Room) owned and operated by defendant Stardust Records, Inc. Stardust, as we shall refer to it, was a corporation, pretty much the shadow of one Charley Raye who owned all or practically all its outstanding shares. Raye had borrowed a sum of money from his brother, defendant Creveling, and had pledged all his shares of Stardust stock to secure the note he gave him.

Raye died October 16, 1959, and four days later Creveling, acting on the premise that as pledgee of the stock he was privileged to do so, joined with others to hold a stockholders' meeting, at which they elected defendant Crooks and two others as the board of directors of Stardust. The same day Crooks was elected president of Stardust by vote of the new directors.

Just a little more than a month after he began acting as president, Crooks executed, on behalf of Stardust, an option agreement, a receipt, an agreement for sale of inventory, and an employment agreement, all steps in the transaction whereby plaintiffs acquired an option to purchase from Stardust its Flame Room, including the furniture, its general on-sale liquor license and its other assets. Plaintiffs paid Crooks —for Stardust—$8,000 for the option, and plaintiff Steve Beraksa was employed to manage the business.

Plaintiffs entered into possession of the Flame Room on December 1 and undertook its operation. Advised by the Alcoholic Beverage Control Board that the attempt to sell to the plaintiffs the alcoholic stock on hand was ill-advised, to say the least, on December 9 Crooks, as president of Stardust, sent plaintiffs a telegram canceling the sale of the wet goods. Then Donna, the widow of Charley Raye, having been appointed administratrix of his estate, and one or two others, called a meeting of the stockholders of Stardust, replaced Creveling's board of directors with a new board which straightaway elected Donna president of the corporation. On January 8, 1960, a demand was made by the Stardust upon the plaintiffs to surrender posession of the Flame Room. They complied with the demand two days after it was made and found themselves out $8,000 and out of the Flame Room.

The plaintiffs immediately (January 15) brought this action by filing a complaint drafted in five counts. Defendants Crooks and Creveling joined in an answer, admitting, generally, the facts beginning with the option transaction, which we have narrated and which the complaint set forth. They

added, as an affirmative defense, as had also been alleged in the complaint, that there was a difference of opinion about Crooks' status as president. Defendant Stardust filed its own answer and in addition a cross-complaint in which it sought to recover from Crooks and Creveling the sum of $1,500.

The trial was before the court without a jury and upon findings of fact and conclusions of law a judgment was entered with these provisions in plaintiffs' favor: (a) an award of $8,000 against Creveling and Crooks, jointly and severally; (b) an additional award of $1,000 against Crooks; (c) one for the same amount against Creveling; and (d) one against Stardust for $959.23. In favor of the cross-complainant Stardust the judgment gives recovery of: (e) $1,500 against Crooks and Creveling, jointly and severally; (f) $500 against Crooks; and (g) a like amount against Creveling.

The judgment was a straight money judgment and did not declare the rights and duties of the parties. The disputes between the parties were resolved in the findings and conclusions, however, and must be read as a part of the judgment, filed the same day, to ascertain the basis for the judgment.

We must look to two separate causes of action to appraise the judgment's final award, that of $8,000, to plaintiffs against Crooks and Creveling. Its basis as to Crooks is that plaintiffs paid him $8,000 under the various instruments that he had executed in his role as president of Stardust; that he was not its president and had no authority as its agent to receive the $8,000; the plaintiffs were out that sum without any return.

This award is upheld by the facts found, and they are supported by the evidence. At the beginning of events Crooks was neither a shareholder nor an officer of Stardust. But for Creveling's "election" of the board of directors that voted Crooks in, Crooks had no standing whatever in the picture other than as Creveling's attorney and the attorney for Donna Raye in her petition to be appointed administratrix. But Creveling had no legal right to elect the directors. They, then, were not de jure directors and have no history of activities as directors that would throw the cloak of "de facto" over them as they voted for Crooks as president. He, therefore, never became the de jure president of Stardust, and his entry into the office lacked that "color of title" that is essential to the "de facto" status that is claimed for him.

 To be sure, Raye, the original holder of the 200

shares that had been issued, entered into an agreement to pledge them to Creveling. That agreement provided that "so long as the terms, provisions and conditions of [this] agreement shall be kept, observed and performed by the shareholders, the shareholders shall have the right to vote the said shares . . . at all meetings of the shareholders. . . ." The terms of the agreement, which incorporated the terms of the note in its provisions, had not been kept; the note had not been paid as promised. Under these circumstances we find pertinent these words taken from *Lawrence* v. *I. N. Parlier Estate Co.* (1940) 15 Cal.2d 220, 228-229 [100 P.2d 765, 770] : "Of course, a pledgee has a right to register the shares to himself when he holds the certificate by proper endorsement or assignment, but we see no reason why he should not be allowed to contract not to exercise such right. And it is still the rule that a pledgee may vote the pledged shares only if they have been registered in his name (Civ. Code, § 320b), for if the shares be not registered to him, the pledgor remains the voting registered owner." Section 320b has been supplanted by section 2218 of the Corporations Code, but the law remains the same, and while the right of Creveling, as pledgee, to have the shares registered in his name had been suspended some time before he undertook to vote the shares the suspension had run out. He, however, had failed to exercise that right, so that, up until his death, Charley Raye remained "the voting registered owner." Upon his death, the shares standing in his name could be voted "only by his executor or administrator. . . ." (Corp. Code, § 2220.) Donna Raye, not Creveling, succeeded to Charley Raye's voting rights.

Several principles that should be kept in mind are recognized in *John Paul Lumber Co.* v. *Agnew* (1954) 125 Cal. App.2d 613, 619 [270 P.2d 1044, 1048-1049]. One of these is that whether one who is not a de jure officer is a de facto officer is one of fact for the trial court to decide. Another, that a solitary exercise of power, even under color of title, does not make one a de facto officer. A mere usurper, not acting under any color of office, is not a de facto officer. It was held in *Potomac Oil Co.* v. *Dye* (1910) 14 Cal.App. 674, 681 [113 P. 126, 130], that a secretary elected by a board of directors that had been superseded could not be a de facto secretary; he "did not acquire even a color of right to the office. . . ." Applying these principles it is clear that Creveling, whose only acts were to

"call" a meeting and by his vote elect the directors, was not thereby constituted a de facto officer. The *"color of title"* conferred by directors whose only act was to elect Crooks president, was too pale to confer upon Crooks the mantle of de facto officer. We cannot say that, as a matter of law, the trial court erred in its unmistakable determination that Crooks had no authority to represent Stardust, either as a de jure or de facto president. Rather, we conclude that its decision was the correct one.

The second cause of action was in the form of the common law action for money had and received. Not only were its allegations found to be true, as to Crooks, but more specific findings established that the $8,000 had been paid to Crooks and not to Creveling, and the "money had and received" averment was specifically found to be "false and untrue" as to Creveling. We must look elsewhere than the facts considered up to this point, therefore, for the basis of the $8,000 award against Creveling. It is to be found in the fifth cause of action.

To affirm the award we must overlook some irregularities, but at this stage of the proceedings we think it proper to do so. To begin with, the fifth cause of action did not plead the existence of the various written instruments that were, by reference, made a part of the first count, and, by reference, also a part of the fourth cause of action. The pretrial agreement, however, established these as facts in the case. Again, the fifth cause of action, which is one for fraud on the part of both Creveling and Crooks in representing that Crooks had the authority to execute "the aforesaid instruments," includes in its allegations that Creveling told them that he "was the sole and lawful owner of all of the issued and outstanding stock" of Stardust, and this was found to be true in the findings, and again in the conclusions. But the evidence fails to support this allegation; on the contrary, plaintiff Steve Beraksa testified that he was not told this. However, in the pretrial statement we find it to be stipulated that "Creveling represented to plaintiffs that he had the sole and absolute right to cause and consent to the sale and transfer of the corporate assets in the manner recited in the agreements attached to plaintiffs' complaint." Whether or not these representations were true or false was set up as one of the issues remaining to be tried. It was tried and the trial court found that it was not true, but false. The inclusion of the further finding that was unsupported by the

evidence should not be permitted to cast doubt on the correctness of the findings that plaintiffs are out $8,000 because they relied, in part, upon Creveling's false representation that he had the authority requisite to pass title to Stardust, which, as it turned out, he did not have. ▮ If it should be conceded—which the trial court did not—that Creveling's representations of his authority were not known to him to be ill-founded, they remain the basis for the findings of fraud because they were made by him to plaintiffs with a positiveness not warranted by his knowledge. (See Civ. Code, § 1710, and *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15, 20].)

▮ The third award of the judgment, that of $1,000 against Crooks, is based upon the fourth cause of action. In it the plaintiffs sought recovery of damages against Crooks alone, not on the theory of fraud, but because of the breach of his warranty that he had authority, as president of Stardust, to sell the Flame Room. Their claim to $42,000 for loss of a good bargain was denied, but they were allowed $1,000, the amount incurred for attorney fees "for the commencement and prosecution" of this action against Stardust. This provision of the judgment is warranted by the concluding words of section 3318, Civil Code. In its statement of the measure of damages caused by the breach of an agent's warranty of authority, the section includes "and the reasonable expenses of legal proceedings taken, in good faith, to enforce the act of the agent against his principal." Although section 3318 was enacted in 1872, it has been cited only three times[1], and in none of these cases were attorney fees in issue. We entertain no doubt, however, of the validity of the provision authorizing recovery for them in such a case as this.

▮ The next recovery given to the plaintiffs, $1,000 against Creveling, is awarded as exemplary damages. It is plain from the evidence that Creveling was the actor, the salesman, with whom the plaintiffs dealt. The plaintiffs were not too alert; they reveal that they thought, in spite of the documents that they signed, that it was from Creveling that they were acquiring the Flame Room rather than from Stardust. He had a self-interest in the deal, as a creditor, and he had a $3,500 commission to make. The trial court could have found that he misrepresented Crooks' authority in good

[1]*Cheda* v. *Grandi* (1950) 97 Cal.App.2d 513 [218 P.2d 97]; *Borton* v. *Barnes* (1920) 48 Cal.App. 589 [192 P. 307]; *Kohlberg* v. *Havens* (1919) 41 Cal.App. 222 [182 P. 467].

faith. But it did not so find. Having rendered a judgment for compensatory damages against Creveling, exemplary damages were not out of order.

We are not persuaded that the doctrine of election of remedies should dictate a reversal of any part of the judgments. We are not unaware of such cases as *Acme Paper Co.* v. *Goffstein* (1954) 125 Cal.App.2d 175, 178 [270 P.2d 505], where an election was said to be required between an action for money had and received and one in which exemplary damages were sought. But it is also true that the doctrine of election of remedies is based upon estoppel, and when applicable, operates only if the party asserting it has been injured. (*Pacific Coast Cheese, Inc.* v. *Security First Nat. Bank* (1955) 45 Cal.2d 75, 80 [286 P.2d 353, 356].) In the case under review the action for money had and received was limited, at the trial, so that it applied only to Crooks. The judgment against Creveling was based on fraud. The award in each case was $8,000. Had the plaintiffs sought recovery for their ordinary damages under section 3318, Civil Code, $8,000 would doubtless have been the extent of the recovery. Crooks was not assessed exemplary damages. We fail to see how either defendant was injured, therefore, by the course the case took, even granting that an action for money had and received is, by a fiction, deemed to be one in contract, while those for damages based on fraud and for a breach of warranty are torts.

We need spend no time with the award of $959.23 in plaintiff's favor against Stardust, as neither of the parties affected has appealed.

The remaining provisions of the judgment that allow the cross-complainant Stardust recovery against Creveling and Crooks have a common premise. It is that the false representations of the two individual defendants caused the plaintiffs to believe that they had acquired some rights from Stardust, and so brought an action against it, which necessitated it to defend at a cost to it of $1,500. Based on these causes and effects judgment was given against both cross-defendants for $1,500 compensatory damages and against each for $500 punitive damages.

We find no California case touching on such a situation as is here presented, but there may always be a first time, and we may find persuasive statements of legal principles elsewhere. In *United States Fidelity & Guaranty Co.* v. *Frohmiller* (1951) 71 Ariz. 377, 379 [227 P.2d 1007, 1008-1009],

the Supreme Court of Arizona, after noting that ''As a general rule attorneys' fees are not recoverable either in the same or a subsequent action unless provided for by statute or by agreement of the parties, . . .'' went on to say: ''Another noteworthy exception to the general rule is stated in 15 Am.Jur., Damages, § 144: 'It is generally held that where the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as legal consequences of the original wrongful act and may be recovered as damages.' ''

The situation in the case under review fits the quotation. The two defendants, one an anxious creditor, the other his attorney, working together, secured a locksmith to open the safe of a business that is not theirs, some four days after the death of the only stockholder of the owner; take unauthorized action to appear as the management, and persuade the plaintiffs that they are. The plaintiffs, with $8,000 invested as a result of the representations made to them, find themselves out in the cold when the legal successors take over. Naturally, plaintiffs take legal action against the corporation owner, as well as against those making the representations. The owner, as naturally, defends itself, and to do so is put to an expenditure for legal services. The item of $1,500 in the judgment in favor of the cross-complainant is thus proper under the principle voiced in the American Jurisprudence quotations, and the obligation being one ''not arising from contract.'' (Civ. Code, § 3294) the award of exemplary damages in the sum of $500 against each codefendant is not an abuse of the trial court's discretion.

The judgment is affirmed.

Burke, P. J., and Jefferson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 26, 1963.